STATE OF NORTH CAROLINA v. STEVEN L. PERIMAN

No. 7612SC356

(Filed 5 January 1977)

1. **Homicide § 15; Infants § 11—— homicide of three year old child — battered child syndrome — admissibility of evidence**

In a prosecution for second degree murder of a three year old child, the trial court did not err in allowing two medical experts to use the term "battered child syndrome" and in allowing them to define what they meant when they used it, since the witnesses were not attempting to say that the victim's wounds were inflicted by defendant, but were instead properly testifying that the group of signs or symptoms they observed upon examination of the victim's body precluded the notion that the injuries were self-inflicted or were inflicted in a manner other than by the intentional violence of another.

2. **Homicide § 21—— death of three year old child — sufficiency of evidence of homicide**

Evidence was sufficient to be submitted to the jury in a prosecution for homicide of a three year old child where it tended to show that defendant beat the child on numerous occasions; defendant had stated before that he was the only one who could discipline the child

properly; the child was left in defendant's care on the day that she died; when the child was left with defendant, she had only two slight bruises on her body; the child died as a result of two fatal blows to the brain; and when the child's body was examined after her death, she was found to suffer from the "battered child syndrome."

**3. Homicide § 27— voluntary manslaughter — instructions proper**

In a prosecution for second degree murder the trial court's instructions on voluntary manslaughter were proper where the jury was required to find that defendant intentionally assaulted the victim with his hands or fist and that death did directly result therefrom, and the jury had previously been told that an assault must be intentionally and unlawfully done with intent to do some harm or injury without any legal justification or excuse.

APPEAL by defendant from *McKinnon, Judge.* Judgment entered 9 December 1975 in Superior Court, CUMBERLAND County. Heard in the Court of Appeals 14 September 1976.

Defendant was charged with the second degree murder of Jacqueline (Jackie) Cliburn.

Evidence for the State tends to show the following:

On 11 October 1974, when she was killed, Jackie was three years old. She was small for her age and had blue eyes and blond hair. She was living in a housetrailer with her female parent, who, at that time, was calling herself Linda Periman. Linda had not been divorced from Jackie's father, Robert Cliburn. Steve Periman, the man with whom Linda most recently lived, was also staying in the trailer.

Defendant Periman beat Jackie on numerous occasions. Several times he took her into a bedroom and the beatings and child's screams could be heard for from five to ten minutes. After these beatings, bruises could be seen on Jackie's buttocks, legs and face. He had been heard to say that he was the only one who could discipline the child properly. On other occasions when others would comment on bruises they saw on the child, Periman's explanations would be that she fell from a table, knocked over a bookcase or was involved in a minor automobile accident.

On 10 October 1974, Linda spent most of the day in the presence of the child. About 4:40 p.m., she went to work, leaving Jackie in the trailer with Periman. At that time she saw no bruises or injuries on the child. She had last seen the child's entire body when she bathed her the day before. At that time

the child had only a slight bruise on her chest and another on her back.

Periman was in the trailer with the child from the time Linda left until she returned, at about 1:00 a.m., and found him asleep on the couch. Linda went in the room where the child ordinarily slept on a set of springs and mattress on the floor. Although she could see well enough to keep from falling over the furniture, the room was not well lighted. Jackie was lying on the mattress and was covered by a sleeping bag. Linda rubbed the top of the child's head and patted her. She did not observe any injuries. She could see that the child was breathing. She then awakened Periman. The pair then entered their bedroom and went to bed. About 6:00 a.m. Periman got up and went in Jackie's room. He returned and told Linda that Jackie was dead. When Linda looked at Jackie's body she saw that there was blood on the side of her mouth, her lips and eyelids were blue and that the body was cold and turning stiff. Periman and Linda then took Jackie's body to a hospital where it was examined by Dr. Azzoli. He observed the following:

"Upon my examination I found that the child was very cool; she was motionless, not breathing; upon examination of her heart, there were no heart sounds; there was no blood pressure recordable; there was no pulse; we checked her pupils and they did not respond to any reflex or stimuli. Upon further examination, it was noted that she had some blood left in her left nostril which was dried. She has an area in the back of her head which was about 3½ inches in diameter, roundish, turned soft, with a soft layer. This was on the lower back portion of the head. She had bruises on her body; she had several small bruises on her forehead; some on her cheek, several on her chest, on her thighs; there were two bite marks on her forearms, both forearms, one on each side. There were areas of bruising on her back also and it was noted that some of these bruises appeared to be older than others. I did not count the exact number of bruises I observed but I would estimate them to be at least eight to ten."

In Dr. Azzoli's opinion the child had been dead for several hours before it was seen by him.

The chief pathologist at the hospital performed an autopsy at about 10:00 a.m. on that morning and later, on 18 October

1974, the Assistant Chief Medical Examiner in Chapel Hill performed another one. Both of these doctors testified in detail as to their findings. The doctor with the Medical Examiner's office was allowed to use photographic slides to illustrate his testimony. Their testimony, in general, tended to show the following:

The body was covered with between 25 to 30 bruises on the face, scalp, chest, stomach, back, buttocks and extremities. There was a laceration in the region of the right eyelid extending into the white of the eye. There was evidence of an old unexplained fracture of one of the legs. Some of the blows causing the bruises (particularly to the lower body) may have been inflicted several days before death. Others were inflicted from one to six or eight hours before death. The internal autopsies exposed five bruises on the reflected scalp. The cause of death was a swelling of the brain caused by trauma of blunt force to the head. The bruises on the brain were distributed on the left back and the right middle portions of the brain on almost opposite sides of the skull. At least two separate and apparently fatal blows were necessary to create those bruises. The fatal wounds were not caused by a fall. The child had apparently bitten herself on each arm just below the elbow.

After defendant was arrested he made a statement in which he said that Linda went to work, he fed Jackie and then went to sleep on the couch. Later, he said, Jackie awakened him and complained of a headache. He said he put the child to bed and then went back to sleep. He did not awaken until Linda came home about 1:00 a.m. About 6:00 a.m. he went to awaken Jackie and found her lying partly on the mattress and partly on the floor. He saw blood on the mattress cover and felt Jackie's cold body. She was not breathing and her heart was not beating. He then dressed and, along with Linda, took the child to a hospital.

The State also offered evidence tending to show that defendant tried to persuade Linda not to talk with an investigator about the child's death. Linda had also been charged with second degree murder in connection with the child's death but that charge was apparently dropped when she pleaded guilty to bigamy and child abuse and agreed to testify for the State.

Defendant offered no evidence.

The jury returned a verdict of guilty of voluntary manslaughter. Judgment imposing a prison sentence was entered.

*Attorney General Edmisten, by Assistant Attorney General Roy A. Giles, Jr., for the State.*

*Faircloth, Fleishman & Beaver, by H. Gerald Beaver, for defendant appellant.*

VAUGHN, Judge.

[1]  In his first assignment of error defendant contends that it was error to allow two of the doctors' testimony concerning "their respective diagnosis of and understanding of 'the battered child syndrome.'"

Dr. Beddow had just testified as to his findings as a result of the autopsy. The following then took place:

"From my examination of the bruises on the body itself, I have an opinion that, as related to the time of death of the patient, the bruises occurred at varying stages in time prior to death. We can determine this by the coloration which there is characteristic changes that occur in a bruise or a contusion by time interval, and judging from this, they were of varying ages, probably none older than three days, some more recent.

Q. And, Doctor Beddow, based upon the cause of death which you formed your opinion to, as well as the entire gross autopsy that you made, did you make a diagnosis based on what you found?

Mr. Beaver: Objection.

Court: Objection overruled.

A. As I have mentioned, the cause of death was blunt head trauma dealt from at least two different directions. It falls into my concept of what is called in medical terminology a battered child syndrome.

Mr. Beaver: Objection; move to strike.

Court: Motion denied.

Exception No. 1.

Q. What was that word; I did not hear you?

A. A battered child syndrome.

Q. Now what exactly is your understanding, Doctor Beddow, of the battered child syndrome?

MR. BEAVER: Objection.

COURT: Objection overruled.

A. My concept of this, and this is an entity that is a little difficult to define—people do use it differently—my concept of it is a child which is not necessarily malnourished or not taken care of but has evidence of trauma or blunt blows at varying intervals and time periods they are usually young children and often have a history of injuries sometimes leading to death.

EXCEPTION No. 2.

MR. BEAVER: Motion to strike, your Honor.

COURT: Motion denied.

EXCEPTION No. 3.

Q. How recent a medical concept is this, Dr. Beddow?

A. My first encounter with this particular syndrome as it's used today or as I use it was approximately four to five years ago.

Q. Are there any other parts or building blocks which make up the battered child syndrome which you found present in the body of Jacqueline Cliburn?

MR. BEAVER: Objection.

COURT: Overruled.

A. In this particular case there was evidence of multiple injuries of various kinds and subsequently a traumatic death.

EXCEPTION No. 4."

Dr. Anderson also testified as to the result of the autopsy performed by him. He described in detail the nature of the wounds and was of the opinion that death was caused by two or more blows to the brain. Defendant excepted, as indicated, to the following:

"Q. Doctor Anderson, based on the autopsy which you performed, and based on your expertise in the field of

Forensic Pathology, did you make a diagnosis based upon what you had observed on Jacqueline Mari Cliburn on the 18th day of October, 1974?

MR. BEAVER: Objection.

COURT: Overruled.

A. Yes, I did.

Q. What was your diagnosis?

MR. BEAVER: Objection.

A. The general pattern of the various ages of bruises distributed over the area of the back, the buttocks, the head, and coupled with the findings of an older injury to the leg, indicate to me that this is a syndrome known recently in medical circles as the battered child syndrome.

MR. BEAVER: Move to strike.

COURT: Motion denied.

EXCEPTION No. 7.

Q. Now what, Doctor Anderson, do you understand generally to be the battered child syndrome?

MR. BEAVER: Objection.

COURT: Overruled.

EXCEPTION No. 8.

A. The battered child syndrome is a situation where injuries are inflicted upon a child by a parent, guardian, baby-sitter, someone in charge at the time of discipline of the child. The injuries are effected or applied in such a manner as to be of a severity more than what is usually given in a disciplinary measure.

Q. Without referring to the person, can you describe for us about the battered child syndrome?

MR. BEAVER: Objection.

COURT: Overruled.

EXCEPTION No. 9.

A. All right, they are inflicted generally in a disciplinary or punishment situation.

MR. BEAVER: Objection; move to strike.

COURT: Objection overruled.

EXCEPTION No. 10.

A. The force that is applied is excessive—

MR. BEAVER: Motion to strike.

COURT: Motion allowed; do not consider that statement, members of the jury.

A. All right, the force that is applied is more than what is usually applied in a disciplinary action of a guardian or parent to a child.

MR. BEAVER: Objection; move to strike.

COURT: Motion denied.

EXCEPTION No. 11.

A. The injuries, therefore, inflicted are more severe than injuries, if any injuries are sustained, during a disciplinary action.

MR. BEAVER: Motion to strike.

COURT: Motion denied.

EXCEPTION No. 12."

We find no error in allowing the medical experts to use the term "battered child syndrome" and in allowing them to define what they meant when they used it. The term was used with tacit approval in *State v. Fredell,* 17 N.C. App. 205, 193 S.E. 2d 587, and on appeal, though the precise questions were not before the Supreme Court, that Court said, without further comment: "The condition of the child was diagnosed as that of a 'battered child,' a term meaning the most extreme form of child abuse, characterized by multiple injuries in different stages of healing." *State v. Fredell,* 283 N.C. 242, 195 S.E. 2d 300. In the case before us, the doctors were not attempting to say that the wounds were inflicted by defendant. The doctors were saying, as we believe they were properly allowed to do, that the group of signs or symptoms they observed precludes the notion that the injuries were self-inflicted or inflicted by other than the intentional violence of another.

"In other words, the 'battered child syndrome' simply indicates that a child found with the type of injuries outlined above has not suffered those injuries by accidental means. This conclusion is based upon an extensive study of the subject by medical science. The additional finding that the injuries were probably occasioned by someone who is ostensibly caring for the child is simply a conclusion based upon logic and reason. Only someone regularly 'caring' for the child has the continuing opportunity to inflict these types of injuries; an isolated contact with a vicious stranger would not result in this pattern of successive injuries stretching through several months." *People v. Jackson,* 18 Cal. App. 3d 504, 95 Cal. Rpts. 919, at p. 921.

Defendant's first assignment of error is, therefore, overruled.

Defendant has expressly abandoned his second assignment of error.

[2] In his third assignment of error defendant contends the court erred in denying his motion for nonsuit made at the close of the State's evidence. The sole basis of the argument is that there is no evidence tending to show that defendant was the one who inflicted the blows resulting in the child's death. We have set out the evidence in considerable detail. When the well-established rules that determine how the evidence must be considered on a motion for nonsuit are applied to that evidence, it seems clear that the judge properly denied the motion. *State v. Ledbetter,* 4 N.C. App. 303, 167 S.E. 2d 68; *State v. Sallie,* 13 N.C. App. 499, 186 S.E. 2d 667. *See also State v. Loss,* 295 Minn. 271, 204 N.W. 2d 404. Moreover, the evidence would have permitted the jury to have found defendant guilty of murder as charged in the bill of indictment.

[3] The question posed by defendant in his fourth assignment of error is as follows: "Did the trial court commit reversible error in charging the jury as to the law of voluntary manslaughter?"

The court instructed the jury it could return one of four verdicts: (1) guilty of second-degree murder; (2) guilty of voluntary manslaughter; (3) guilty of involuntary manslaughter; or (4) not guilty and then proceeded to define the three degrees of homicide he was allowing them to consider. There are no exceptions to the submission of these possible verdicts.

The exceptions that are the basis of the assignment of error are Nos. 14 and 17, found on pages 73 and 84 of the record.

Exception No. 14 is to the part in parenthesis of the following:

"If the defendant intentionally assaulted Jacqueline Cliburn with his hands or fists and used such force that under the circumstances that force was likely to cause death and that death directly resulted from the use of that force, he would be guilty of second degree murder.

Or if the defendant carelessly applied force to the person of Jacqueline Mari Cliburn under such circumstances that danger to life clearly appeared from the application of that force, and he did so recklessly or wantonly so as to show an utter disregard for human life, and that death directly resulted from the use of that force, he would be guilty of second degree murder.

As I've said, members of the jury, voluntary manslaughter is the intentional, unlawful killing of a human being without malice and without premeditation.

(Again it is not necessary that there be a specific intent to kill, but there must be an intent to do an unlawful act which directly and naturally causes the death of another person, and it must be such an act that is reasonable to foresee that death was likely to result from such conduct. So if the defendant intentionally assaulted Jasqueline Mari Cliburn with his hands or fists but you do not find beyond a reasonable doubt that the force he used was such that it was likely to cause death under the circumstances but death did, however, directly result from the use of that force, then under those circumstances he would be guilty of voluntary manslaughter. Voluntary manslaughter requires an intentional act that directly results in death but not such an act that under the circumstances appeared likely to cause a death.)

EXCEPTION No. 14."

Exception No. 17 is to the following part of the final mandate as it relates to voluntary manslaughter:

"[I]f you are satisfied from the evidence that the defendant intentionally assaulted Jacqueline Mari Cliburn with

State v. Periman

his hands or fists but you do not find that the force used under the circumstances was likely to cause death, although death did directly result from the use of that force, if you find those to be the facts beyond a reasonable doubt, the defendant would be guilty of voluntary manslaughter. EXCEPTION No. 17."

Defendant's fifth assignment of error is based on Exception Nos. 15, 16 and 18 and is directed to the following part of the charge (in parenthesis) as it related to involuntary manslaughter:

"Turning to involuntary manslaughter, members of the jury, (if the defendant undertook to act in the place of a parent to the child and in doing so was so grossly careless and negligent in his treatment of the child as to show a wanton and reckless behavior and a total disregard for her rights and safety, although his conduct was not such as to show an utter disregard for human life, and if death directly resulted from that conduct, then he would be guilty of involuntary manslaughter.)

EXCEPTION No. 15.

Mere carelessness or negligence is not enough to carry criminal responsibility, but if carelessness or negligence is accompanied by wanton or reckless behavior, showing a total disregard for the rights and safety of others, it is culpable negligence for which one may be criminally responsible.

(The intentional violation of a statute designed for the protection of life or limb is culpable negligence, and if death directly results from the intentional violation of such a statute, that is involuntary manslaughter. We have a statute which provides that if a person providing care for a child under sixteen years of age inflicts physical injury on such a child by other than accidental means, he is guilty of the misdemeanor of child abuse. So if the defendant was providing care for Jacqueline Mari Cliburn and in doing so, he intentionally inflicted injury upon her and she was a child under sixteen years of age, and if her death directly resulted from that injury, he would be guilty under those circumstances of involuntary manslaughter.)

EXCEPTION No. 16."

Exception No. 18 was to substantially the same instruction when it was repeated in the judge's final mandate.

We have set out all of the charge to which defendant excepted. In other parts of the charge the judge instructed the jury on all elements of the possible verdicts. He instructed them as to how to arrive at a decision on defendant's intent. He instructed them on what they might consider in determining whether defendant acted with malice, and among other things, he told them:

"I've said that the killing must be intentionally done, members of the jury. That does not mean that a specific intent to kill is necessary in the mind of the person. If an act is intentionally done which directly and naturally results in death and there is no legal provocation or excuse, the law implies malice. So a specific intent to kill is not necessary, but the act which causes death must be intentionally done, and it must be such an act that danger to life therefrom is a likely and foreseeable result."

He also told them:

"If an assault is committed with hands or fists on an infant of tender years, using such force as is likely to cause death, that would be an assault with a deadly weapon, and if death actually resulted, the law implies malice, and that would be second degree murder."

We hold that, when the entire charge is considered, the judge properly declared and explained the law arising on the evidence as given in the case *then being tried.*

Murder in the second degree is the unlawful killing of a human being *with malice* but without premeditation and deliberation. Manslaughter is the unlawful killing of a human being *without* malice and without premeditation and deliberation. Only the element of malice, therefore, separates these two degrees of homicide. It was for the jury to determine the presence or absence of malice on the part of the defendant.

The charge was abundantly fair to this defendant. Malice may be implied from circumstances other than the use of a deadly weapon. Here, however, in order to find the malice necessary to support second degree murder the judge, in effect, required the jury to find that defendant intentionally used his

hand or fist as a deadly weapon. In order to find that the hand or fist was used as a deadly weapon the jurors were required to find that the hand or fist was, as used under the circumstances, likely to cause death. "A deadly weapon is not one that must kill. It is an instrument which is likely to produce death or great bodily harm, under the circumstances of its use." *State v. Cauley,* 244 N.C. 701, 94 S.E. 2d 915. They were further required to find that the death "directly resulted" from the use of that weapon. The jury failed to find that the hand or fist was used as a deadly weapon and, under the charge of the court, thus failed to find malice that would support a verdict of guilty of second degree murder.

The jury then, as instructed, proceeded to consider voluntary manslaughter. Having failed to find the killing was by the use of a deadly weapon, they were, in order to convict of voluntary manslaughter, required to find that defendant "intentionally assaulted . . . [Jackie] with his hands or fist" and that "death did directly result" therefrom. The jury had theretofore been told that an assault must be "intentionally and unlawfully done with intent to do some harm or injury without any legal justification or excuse. . . ."

The jury then found that defendant intentionally and unlawfully, with intent to cause injury and without any legal excuse, struck the deceased a blow or blows that directly caused her death. That verdict was supported by the evidence which the jury considered on proper instructions from the able trial judge.

We have also considered defendant's exceptions with reference to the instructions on involuntary manslaughter and conclude that they cannot be sustained.

Defendant has had a fair trial that was free from prejudicial error.

No error.

Chief Judge BROCK and Judge MARTIN concur.