STATE OF NORTH CAROLINA v. KENNETH D. WILKERSON

No. 84

(Filed 17 October 1978)

**1. Criminal Law § 53— expert medical testimony—test for admissibility**

In determining whether expert medical opinion is to be admitted into evidence, the inquiry should not be whether it invades the province of the jury, but whether the opinion expressed is really one based on the special expertise of the expert, that is, whether the witness because of his expertise is in a better position to have an opinion on the subject than is the trier of fact.

**2. Criminal Law § 53.1— expert medical testimony—battered child syndrome**

In this prosecution for the second degree murder of a two-year-old child, the trial court properly allowed a pediatrician to state his opinion that bruises on the child's chest did not form the typical bruising pattern normally sustained by children in day to day activities based on the pediatrician's observation of lesions and bruises about children which had occurred in the normal course of events. Furthermore, the court properly permitted a pathologist to give his opinion that the child was a "battered child," to explain that term, and to give his opinion that the "battered child syndrome" usually results from the use of excessive force in a disciplinary situation by a parent, guardian or other custodian of the child where the pathologist's testimony was based on his experience and his knowledge of the subject as contained in medical literature.

**3. Criminal Law § 85.2— character witness—cross-examination—specific acts of misconduct by defendant**

The trial court in a homicide case erred in permitting the prosecuting attorney to cross-examine defendant's mother, who testified as a character witness for defendant, as to whether defendant had previously participated in two gang shootings, since a character witness may not be cross-examined as to

559

specific acts of misconduct on the part of the defendant. However, defendant was not prejudiced by such error where the witness, while admitting some knowledge of the incidents, denied defendant's involvement therein and offered a plausible exculpatory explanation of the misconduct suggested by the prosecutor's questions, and where there was plenary evidence in the case strongly suggesting defendant's guilt.

**4. Criminal Law § 99.2— manner of submitting verdicts—no expression of opinion**

The trial judge did not improperly convey his opinion to the jury that defendant had to be guilty of something by the manner in which he submitted to the jury the alternative verdicts of murder in the second degree, voluntary manslaughter, involuntary manslaughter, and not guilty.

**5. Homicide § 5— second degree murder—intent to kill—malice**

While an intent to kill is not a necessary element of second degree murder, the crime does not exist in the absence of some intentional act sufficient to show malice and which proximately causes death.

**6. Homicide § 5— second degree murder—malice**

Statements in prior cases that "an intent to inflict a wound which produces a homicide is an essential element of murder in the second degree" and that "second-degree murder imports a specific intent to do an unlawful act" are not universally applicable. It is more fundamentally sound to say that any act evidencing wickedness of disposition, hardness of heart, cruelty, recklessness of consequences, and a mind regardless of social duty and deliberately bent on mischief, though there be no intention to injure a particular person, is sufficient to supply the malice necessary for second degree murder.

**7. Homicide § 26— second degree murder—no intentional act—erroneous instruction—harmless error**

In a prosecution for the second degree murder of defendant's two-year-old child, the jury could not have been misled to defendant's prejudice by the trial court's erroneous instruction that second degree murder could exist "where there is no intentional act" where, considered in context, it appears that the court used this phrase in the sense of a specific intent to kill; the court correctly charged the jury on the necessity to find that the *acts* committed by defendant against the child were intentional; and the court further correctly charged the jury that in order to return a verdict of guilty of second degree murder, it had to find "an act of culpable negligence which causes danger to another and the act is so recklessly or wantonly done as to indicate a total disregard for human life."

**8. Homicide §§ 5, 21.7— second degree murder—malice—disregard for human life**

An act that indicates a total disregard for human life is sufficient to supply the malice necessary to support the crime of second degree murder.

**9. Homicide §§ 5, 6.1— culpable negligence—second degree murder—involuntary manslaughter**

An act of culpable negligence, standing alone, will support at most a conviction of involuntary manslaughter, but when an act of culpable negligence also imports danger to another and is done so recklessly or wantonly as to

manifest depravity of mind and disregard for human life, it will support a conviction of second degree murder.

**10. Homicide § 6.1— involuntary manslaughter—intentional act**

While involuntary manslaughter imports an unintentional killing, i.e., the absence of a specific intent to kill, it is accomplished by means of some intentional act.

**11. Homicide §§ 6.1, 27.2— involuntary manslaughter—violation of child abuse statute**

An intentional violation of some statute designed for the protection of people which proximately though unintentionally causes death can support a conviction of involuntary manslaughter. Therefore, the trial court properly instructed the jury that defendant could be found guilty of involuntary manslaughter of his two-year-old child if the child's death resulted from defendant's intentional infliction of injuries on the child in violation of provisions of the child abuse statute, G.S. 14-318.2.

**12. Homicide § 27.1— voluntary manslaughter—intentional assault—erroneous instruction**

The trial court erred in instructing the jury that defendant would be guilty of voluntary manslaughter if he intentionally assaulted the two-year-old victim "with his hands, fists or feet, but you do not find beyond a reasonable doubt that the force he used was . . . likely to cause death . . . but that death did occur as the direct result of the use of that force," since such a state of facts would render defendant guilty at most of involuntary manslaughter.

**13. Homicide § 32.1— submission of voluntary manslaughter—error cured by verdict**

In this prosecution for the second degree murder of defendant's two-year-old child, the trial court erred in instructing the jury on voluntary manslaughter where there was no evidence that defendant killed under the heat of passion raised by sudden provocation and no evidence of self-defense. However, defendant was not prejudiced by the erroneous submission of voluntary manslaughter since he was convicted of second degree murder.

Justice BRITT took no part in the consideration or decision of this case.

BEFORE *Godwin, J.*, at the 28 February 1977 Criminal Session of CUMBERLAND Superior Court and on a bill of indictment proper in form, defendant was tried and convicted of second degree murder and sentenced to life imprisonment. He appeals under General Statute 7A-27(a). This case was argued as No. 48 at the Fall Term 1977.

*Rufus L. Edmisten, Attorney General, by Roy A. Giles, Jr., Assistant Attorney General, for the state.*

*William Wicker and Deno G. Economou, Attorneys for defendant.*

EXUM, Justice.

The homicide victim in this tragic affair was Kessler Wilkerson, the two-year-old son of defendant and his wife, Nancy. The state's evidence tended to show, and the jury apparently believed, that the child's death was the result of physical abuse inflicted upon him by his father. On his appeal defendant contends the trial court erred in (1) admitting into evidence expert medical opinion having to do with the "battered child" syndrome; (2) permitting cross-examination of defendant's mother as to acts of misconduct earlier committed by defendant; and (3) improperly instructing the jury, principally by failing properly to define the crimes of second degree murder, voluntary manslaughter and involuntary manslaughter. With regard to the first contention, we find no error. We agree with defendant that the cross-examination of his mother was improper; but we also conclude under the circumstances that no prejudice resulted. As to the third contention the error committed was favorable to defendant.

The state's evidence, in summary, is as follows: On 16 October 1976 around 10:30 a.m., neighbors heard loud sounds "like something was being throwed inside the trailer" coming from the Wilkersons' mobile home, the voice of a little boy crying, and defendant shouting at him to shut up. Mrs. Wilkerson appeared at the door of the trailer, said, "Hurry up, Kenny, hurry up," and slammed the door closed. Pursuant to a call an ambulance arrived at the Wilkerson trailer at 12:42 p.m. Defendant delivered the child's limp body to ambulance attendants and told them he had choked on some cereal, swallowed some water, and stopped breathing. Cardiopulmonary resuscitation was applied unsuccessfully en route to the hospital. The child was dead on arrival there. The emergency room physician who examined the child found no fluid in his lungs or other signs of drowning. Bruises were present on his chest, shoulders, upper arm and forearm. Upon being informed that his son was dead, defendant appeared "quite calm and told his wife something to the effect that it's done, it's over, there's nothing we can do about it now." An autopsy revealed, externally, multiple bruises all over the child's body and, internally, significant bleeding and a deep laceration of the liver. Cause of death was abdominal hemorrhage from a ruptured liver.

Other evidence for the state, consisting of defendant's pre-trial statement made to investigating officers .and the. testimony of other witnesses who had observed defendant in his relationship with his son, tended to show the kind of disciplinary methods defendant. customarily used with the child. According to this evidence defendant frequently kicked the child and on occasion made him stand "spread eagle" against a wall for long periods of time. One such occasion was 14 October 1976, two days before the boy died. Defendant at that time kicked him with such force that his chest hit the wall. One witness testified that defendant had said the little boy had no manners and that he was determined to teach him some manners and bring him up to be a man the way that "his [defendant's] mother has raised him, that his mother put him through hell." When asked why he wanted to repeat his mother's treatment, defendant "said that he didn't really approve of it or like it but it made him a man, and that's the way his son was going to be."

Defendant testified that his relationship with his son had been close. Although admitting disciplining his son and occasionally spanking him with a belt, defendant denied ever hitting or kicking him. He also denied that he was punished excessively as a child or that he ever talked with state's witnesses about his childhood. He said that on the morning of 16 October the child had wet himself on the floor. Defendant spanked him with his wife's belt and then ran some water in a tub and made him get in whereupon the child began "gasping for air and choking." Defendant searched his throat for possible obstructions, patted him on his back, and applied mouth-to-mouth resuscitation, all without any success. On cross-examination defendant admitted spanking his son on 16 October "hard enough to make him cry as long as I beat him."

Several witnesses testified that the relationship between defendant and his son was good and that they had never seen defendant abuse the child in any way. Defendant's mother testified that defendant treated his younger brothers and sisters in a kind manner while growing up in Philadelphia and that she had never beaten defendant severely or seen him abuse any child.

Defendant first assigns as error the testimony of two medical witnesses — Dr. Casey John Jason, a pediatrician who first exam-

ined the child at the emergency room of Womack Army Hospital, and Dr. John Edward Grauerholz, who performed the autopsy. Specifically, defendant complains of Dr. Jason's testimony that the bruises he observed on the child were not "the typical bruising pattern that is normally sustained by children in [their] normal day-to-day life." Defendant likewise complains of the testimony of Dr. Grauerholz, a pathologist, who after describing at some length his findings on autopsy testified in part as follows:

"DR. GRAUERHOLZ: All right, I made a diagnosis.

MR. GREGORY: And what was that diagnosis, Doctor?

MR. DOWNING: Object.

COURT: Overruled.

DR. GRAUERHOLZ: Battered child.

MR. DOWNING: Move to strike.

EXCEPTION. THIS CONSTITUTES DEFENDANT'S EXCEPTION No. 2.

MR. GREGORY: Dr. Grauerholz, what do you mean by the term 'battered child'?

DR. GRAUERHOLZ: I mean a child who died as a result of multiple injuries of a non-accidental nature.

MR. GREGORY: Can you explain what you mean by 'non-accidental nature'?

DR. GRAUERHOLZ: Yes. That these injuries were inflicted by someone other than the child upon the child.

MR. DOWNING: Move to strike.

COURT: Denied.

EXCEPTION. THIS CONSTITUTES DEFENDANT'S EXCEPTION No. 3.

MR. GREGORY: Is the term 'battered child' a relatively new term in the field of medicine?

MR. DOWNING: Objection.

COURT: Overruled.

DR. GRAUERHOLZ: It's been around for a while. I think probably in the last ten years or so it has become very well established.

MR. GREGORY: Dr. Grauerholz, without referring to any particular person, can you describe for us about the battered child?

MR. DOWNING: Objection.

COURT: Overruled. You are seeking an explanation of the term 'battered child'?

MR. GREGORY: Yes sir.

COURT: Overruled. You may give your explanation, Doctor.

DR. GRAUERHOLZ: These are children who suffer multiple injuries inflicted by others. The injuries are multiple in terms of distribution on the body and in time of infliction in certain cases. They are seen in children who have been perhaps over-zealously disciplined or have in other ways upset or run afoul of their guardians or their caretakers or usually some adult who is in relation to the child. By 'relation' I mean physical relation.

MR. DOWNING: Move to strike.

COURT: Denied.

EXCEPTION. THIS CONSTITUTES DEFENDANT'S EXCEPTION NO. 4.

DR. GRAUERHOLZ: They show essentially such things as abdominal injuries or fractures or other damage that is inconsistent with an accidental origin by virtue of the distribution of the injury. There are certain places where children classically do injure themselves when they fall, they run along and they fall, they bang their knees, they fall on their hands and so forth and these children, however, show injuries in noncharacteristic places, across the back, places where they could not spontaneously fall with sufficient force to produce that sort of injury, deep injuries in the abdomen, again which would necessitate a force being directed to the abdomen. One of the classic findings in a lot of these children

are multiple fractures of varying ages. The bruising I observed in the chest area of the child were those bruises were not bruises characteristic of the everyday life of a child, of being a child from day to day and falling. In my opinion an external striking or compressive force of some sort applied to the abdomen would produce the laceration to the liver.

EXCEPTION. THIS CONSTITUTES DEFENDANT'S EXCEPTION No. 5.

. . . .

MR. GREGORY: My question is, without all the paraphrasing, Your Honor, under what circumstances does the battered child syndrome occur?

COURT: Overruled. You may move to strike. The ruling of the Court does not foreclose your opportunity to move to strike. Go ahead, Doctor.

DR. GRAUERHOLZ: The syndrome usually occurs in a disciplinary situation involving the child and some guardian or custodian, a parent, a relative, a babysitter, someone who has physical custody of the child at that time. The injuries are usually inflicted as a disciplinary measure upon the child.

MR. DOWNING: Move to strike.

COURT: Denied.

EXCEPTION. THIS CONSTITUTES DEFENDANT'S EXCEPTION No. 6.

MR. GREGORY: Now when you say in disciplining the child, what are you talking about, Dr. Grauerholz?

MR. DOWNING: Objection.

COURT: Overruled.

EXCEPTION. THIS CONSTITUTES DEFENDANT'S EXCEPTION No. 7.

DR. GRAUERHOLZ: I am talking about punishment in the sense that one might spank a child for misbehaving. In that sort of situation. A question of corporal punishment. In these cases the punishment is excessive in its result if not necessarily in its intent."

Defendant contends that to permit Dr. Grauerholz to give an opinion that the child was a victim of the battered child syndrome, to explain what this syndrome means, and "to theorize . . . that the child was killed by a parent, a guardian or caretaker who used more force than was called for in a disciplinary situation" was, in effect, to permit the doctor to testify "as to the ultimate fact of the defendant's guilt or innocence" and therefore was improper. Defendant makes no argument in his brief to support his assignment of error with regard to Dr. Jason's testimony. We conclude that all of this testimony was properly admitted.

Defendant relies on the principle that an expert witness should not express an opinion on the very issue to be decided by the jury and thereby invade the jury's province. As this Court has noted before, this principle "is not inflexible, is subject to many exceptions, and is open to criticism." *Patrick v. Treadwell,* 222 N.C. 1, 4, 21 S.E. 2d 818, 821 (1942), quoted with approval in *Bruce v. Flying Service,* 234 N.C. 79, 66 S.E. 2d 312 (1951). "It is frequently relaxed in the admission of evidence as to ultimate facts in regard to matters of science or skill." *State v. Powell,* 238 N.C. 527, 530, 78 S.E. 2d 248, 251 (1953). In *Powell* the defendant was charged with the murder of his wife. The state's evidence tended to show that the defendant intentionally shot his wife with a pistol, the bullet having penetrated his wife's ring finger on her right hand and entered her skull, causing death. The defendant contended and testified that after he and his wife had gone to bed he was awakened by someone pulling at the pistol which he had earlier placed under his pillow. When he raised up his wife "was getting hold of the pistol, he grabbed, and got hold of it, and then it fired." The state's case rested in part on crucial testimony of the physician who performed the autopsy. He testified that it was his opinion based upon his examination of the deceased that when the fatal bullet was fired her "hand was somewhere in front of the face in this particular area (indicating)," and that it "was turned — in other words like that, to her face (indicating)." On appeal and against the defendant's contention that this testimony invaded the jury's province, this Court found no error in the admission of the testimony. Parker, J., later C.J., writing for the Court, said, 238 N.C. at 530, 78 S.E. 2d at 250-51:

"This witness spoke from a professional and personal examination of the body of Bessie Rector Powell, and the

answers, to our minds, were clearly within the domain of expert opinion. The witness had testified in minute detail as to the penetration of the bullet through the ring finger of the right hand into the skull and brain of Bessie Rector Powell, and also the powder burns on her hand and forehead. His opinion required expert skill or knowledge in the medical or pathologic field about which a person of ordinary experience would not be capable of satisfactory conclusions, unaided by expert information from one learned in the medical profession. The questions and answers are approved and upheld, we think, in *S. v. Jones,* 68 N.C. 443 (opinion of doctor who saw deceased as to his posture and position when shot); *S. v. Fox,* 197 N.C. 478, 149 S.E. 735 (opinion of doctor that deceased was lying down when he received the fatal wound); *S. v. Stanley,* 227 N.C. 650, 44 S.E. 2d 196 (physician testified that deceased was in a prone position when fatal injuries inflicted); *McManus v. R.R.,* 174 N.C. 735, 94 S.E. 455 (physician testified the intestate was lying down at the time of injury); *George v. R.R.,* 215 N.C. 773, 3 S.E. 2d 286 (similar opinion testimony as in *McManus case*)."

Expert medical opinion has been allowed on a wide range of facts, the existence or non-existence of which is ultimately to be determined by the trier of fact. *State v. DeGregory,* 285 N.C. 122, 203 S.E. 2d 794 (1974) (sanity of the defendant); *State v. Potter,* 285 N.C. 238, 204 S.E. 2d 649 (1974) (sanity of defendant and competence of defendant to stand trial); *State v. Vestal,* 278 N.C. 561, 180 S.E. 2d 755 (1971) (probable date of death); *State v. Knight,* 247 N.C. 754, 102 S.E. 2d 259 (1958) (death caused by exertion, fear and anger, rather than blows); *State v. Wilcox,* 132 N.C. 1120, 44 S.E. 625 (1903) (contusion caused by blow with a blunt, covered instrument); *but see State v. Griffin,* 288 N.C. 437, 219 S.E. 2d 48 (1975), *death penalty vacated,* 428 U.S. 904 (1976) (psychiatric definition of "intent" properly excluded in murder case); *State v. Carr,* 196 N.C. 129, 144 S.E. 698 (1928) (testimony that deceased could not have fired the shot that killed him where defense was suicide was erroneously admitted). *See generally* 1 Stansbury's North Carolina Evidence § 135 (Brandis rev. 1973).

[1] We conclude, therefore, that in determining whether expert medical opinion is to be admitted into evidence the inquiry should be not whether it invades the province of the jury, but whether

the opinion expressed is really one based on the special expertise of the expert, that is, whether the witness because of his expertise is in a better position to have an opinion on the subject than is the trier of fact. The test is as stated in *State v. Powell, supra,* 238 N.C. at 530, 78 S.E. 2d at 250, whether the "opinion required expert skill or knowledge in the medical or pathologic field about which a person of ordinary experience would not be capable of satisfactory conclusions, unaided by expert information from one learned in the medical profession."

[2]  The opinions expressed by the physicians in this case fall well within the bounds of permissible medical expert testimony. The basis for Dr. Jason's opinion, that the bruises on the child's chest did not form the typical bruising pattern normally sustained by children in day to day activities, was given in his earlier testimony in which he said:

> "In my work in pediatrics I have had the occasion to work with numerous children. At Johns Hopkins I would say somewhere in the neighborhood of five hundred children total. Many times I have had occasion to observe lesions or bruises about children that have occurred in the normal course of events. A child frequently falls on his knees or bang what we call the tibial surfaces, the area underneath the knee, and, of course, bang their elbows and skin their hands and occasionally even fall and hit their heads and in that case get a bruise similar to the one that Kessler had on the front of his head.
>
> MR. GREGORY: Have you had a chance in your work in pediatrics to observe the chests of children?
>
> DR. JASON: Oh, of course, of course."

Likewise, Dr. Grauerholz' opinion that this child was a "battered child" and his explanation of that term were based on his experience as a physician and a pathologist who had at the time of the trial performed over 150 autopsies, and on the fact that the "battered child" syndrome has been a recognized . medical diagnosis for over ten years. For a history of the development of this diagnosis and its ultimate recognition in the medical community *see* McCoid, The Battered Child and Other Assaults Upon the Family: Part One, 50 Minn. L. Rev. 1, 3-19 (1965). Dr.

Grauerholz' opinion regarding the usual cause of the syndrome, again, was based on his expertise in the area and his knowledge of the subject as contained in the medical literature.

Contrary to what defendant seems to argue, neither physician testified, nor should he have been permitted to do so, that the battered child syndrome from which this victim suffered was in fact caused by any particular person or class of persons engaging in any particular activity or class of activities. Nowhere in the record did either physician express or purport to express an opinion as to defendant's guilt or innocence. On these kinds of factual questions the physicians would have been in no better position to have an opinion than the jury.

Upholding the admission of similar testimony, the California Court of Appeals in *People v. Jackson*, 18 Cal. App. 3d 504, 507, 95 Cal. Rptr. 919, 921 (1971) said:

"A finding, as in this case, of the 'battered child syndrome' is not an opinion by the doctor as to whether any particular person has done anything, but, as this doctor indicated, 'it would take thousands of children to have the severity and number and degree of injuries that this child had over the span of time that we had' by accidental means. In other words, the 'battered child syndrome' simply indicates that a child found with the type of injuries outlined above has not suffered those injuries by accidental means. This conclusion is based upon an extensive study of the subject by medical science. The additional finding that the injuries were probably occasioned by someone who is ostensibly caring for the child is simply a conclusion based upon logic and reason. Only someone regularly 'caring' for the child has the continuing opportunity to inflict these types of injuries; an isolated contact with a vicious stranger would not result in this pattern of successive injuries stretching through several months."

As far as our research reveals, all courts which have considered the question, including our own Court of Appeals, have concluded that such expert medical testimony concerning the battered child syndrome as was offered in this case is properly admitted into evidence. *State v. Periman*, 32 N.C. App. 33, 230 S.E. 2d 802 (1977); *State v. Loss*, 295 Minn. 271, 204 N.W. 2d 404 (1973);

*People v. Henson*, 33 N.Y. 2d 63, 304 N.E. 2d 358 (1973); *State v. Best*, 232 N.W. 2d 447 (S.D. 1975).

The cases relied on by defendant, *Hill v. R.R.*, 186 N.C. 475, 119 S.E. 884 (1923); *Mule Co. v. R.R.*, 160 N.C. 252, 75 S.E. 994 (1912); *Summerlin v. R.R.*, 133 N.C. 551, 45 S.E. 898 (1903), are readily distinguishable. In each of these cases the difficulty was that the medical expert was permitted to testify that a certain event had in fact caused the injuries complained of. The court in each case pointed out that it would have been proper to have asked the expert whether the event could or might have caused the injury, but not whether it in fact did cause it. (There may be questions of cause and effect, however, about which an expert should be permitted to give, if he has one, a positive opinion. *Mann v. Transportation Co.*, 283 N.C. 734, 198 S.E. 2d 558 (1973).) The Court in *Summerlin* also relied on the rule that an expert must base his opinion upon facts within his own knowledge or upon facts put to him in a properly phrased hypothetical question.

Defendant's first assignment of error is overruled.

[3] Defendant's next assignment of error relates to the district attorney's cross-examination of Mrs. Gracie Wilkerson, defendant's mother. On direct examination Mrs. Wilkerson described defendant's good relationships with the younger children in the family and testified that she had never seen him abuse any child. The record then reveals these pertinent portions of the cross-examination:

"MR. GREGORY: Well, have you ever heard of your son being involved in a gang and abusing people?

MR. DOWNING: Objection.

COURT: Overruled.

MRS. WILKERSON: No, not really. I've known him to be in fights with people standing around looking.

MR. GREGORY: Yes ma'am. But August 25, 1970 Mr. Wilkerson was in and out of your home wasn't he?

MRS. WILKERSON: Yes.

MR. GREGORY: Have you ever heard the name Wallace Bridges?

MR. DOWNING: Object.

COURT: Overruled.

A. No I haven't.

MR. GREGORY: Is it your testimony then that you have never even heard about your son participating in a gang on or about August 25, 1970 in which a boy named Wallace Bridges was shot and killed?

MR. DOWNING: Objection. Move to strike.

COURT: Overruled. Motion denied.

A. I am not aware of who Wallace Bridges is but if that's what I'm thinking it is, as you know Kenneth was the only one that they, that the person, if this is correct, if it is what you are talking about, it was a handicapped boy that was shot and killed, is this what you are speaking in terms of?

MR. GREGORY: I'm speaking about a young man whose name was Wallace Bridges that was shot and killed on or about August 25, 1970.

A. Right.

MR. DOWNING: Objection.

COURT: Overruled.

A. Kenneth was known not to be there, not by my say-so or anyone that knew Kenneth, this was the cousin to the boy that was shot and killed, he could testify to everybody but he also testified that my son was not there at the time this boy was shot and killed. If that's his name. I don't know his name. Kenneth was not too good on gangs. He always picked one boy at a time and if that boy didn't prove out to be all he thought he was he would let him go.

. . . .

MR. GREGORY: Is it your testimony then that you never even heard about Mr. Wilkerson being involved with a gang shooting on or about January 1, 1972?

MR. DOWNING: Objection.

COURT: Overruled.

State v. Wilkerson

MR. GREGORY: May I complete the question? In which the victim was permanently paralyzed? Is that your testimony?

MR. DOWNING: Objection.

COURT: Overruled.

A. Well, the victim is not permanently paralyzed and Kenneth was not involved in that particular incident. It was my son Joseph Wilkerson. On July 11, 1972 I believe Kenneth was living with my mother at that time in Philadelphia, two and a half blocks away. When he was living with my mother, if matters of serious nature occurred in his life I imagine I would have known about that.

MR. GREGORY: Is it your testimony that you never even heard then about your son Kenneth Wilkerson being involved in a gang shooting in which a member of a rival gang was shot at?

MR. DOWNING: Objection.

COURT: Overruled.

A. No I don't. I don't recall at this time."

Both the state and defendant argue that Mrs. Wilkerson was, in part at least, a character witness for defendant. The state contends that since defendant offered her testimony to show his good character, it was entitled to cross-examine her to show his bad character. Accepting this analysis of the parties, we conclude that it was error to permit this kind of cross-examination. We hold, however, because of the answers given and the presence in the case of evidence quite persuasive of defendant's guilt, that the error was not prejudicial.

The controlling rules as to character evidence are summarized in *State v. Chapman*, 294 N.C. 407, 416, 241 S.E. 2d 667, 673 (1978), *quoting State v. Green*, 238 N.C. 257, 258, 77 S.E. 2d 614, 615 (1953):

"When a defendant introduces evidence of his good character, the State has the right to introduce evidence of his bad character, but it is error to permit the State to cross-examine the character witnesses as to particular acts of

misconduct on the part of the defendant. Neither is it permissible for the State to introduce evidence of such misconduct. The general rule is that a character witness may be cross-examined as to the general reputation of the defendant as to particular vices or virtues, but not as to specific acts of misconduct."

Defendant's objections to the questions set out should therefore have been sustained.

We fail to perceive, however, any prejudice to defendant in the admission of this testimony. The witness, while admitting some knowledge of the incidents, denied defendant's involvement therein. Each denial was accompanied by a plausible exculpatory explanation of the misconduct suggested by the district attorney's question. We are bolstered in our conclusion that no prejudice resulted because there is in this case plenary evidence strongly suggesting defendant's guilt. Where the state's contentions are so strongly supported by competent evidence, it is less likely that evidentiary errors will actually affect the verdict. *State v. Knight*, 282 N.C. 220, 192 S.E. 2d 283 (1972). "Unless there is a reasonable possibility that the erroneously admitted evidence might have contributed to the conviction, its admission constitutes harmless error." *Id.* at 228, 192 S.E. 2d at 288. We find no such reasonable possibility in this case. Accordingly, this assignment of error is overruled.

[4] Under his third assignment of error defendant argues a number of unrelated questions directed to the trial court's instructions to the jury. By arguing unrelated questions under one assignment of error, defendant has ignored Rule 28(b)(3) of the Rules of Appellate Procedure. Nevertheless, we have considered thoroughly each of his arguments. The first relates to the manner in which the trial judge submitted the alternative verdicts of murder in the second degree, voluntary manslaughter, involuntary manslaughter, and not guilty to the jury. Defendant contends the method adopted by the trial judge improperly conveyed his opinion to the jury "that the defendant had to be guilty of something." No authority is cited in support of his argument. We have examined these portions of the instructions and find defendant's contention without merit and undeserving of discussion.

State v. Wilkerson

Defendant next contends that the instructions do not properly define the various degrees of homicide submitted to the jury. The pertinent instructions were given as follows (Those portions actually excepted to are in italics. According to the bill of indictment and the court's instructions elsewhere, Kessler Wilkerson was sometimes known as "Kessler Patterson."):

> "*Second degree murder may also exist where there is no intentional act where there is an act of culpable negligence which carries danger to another and the act is so reckless or wantonly done as to indicate a total disregard for human life, and death proximately results from the act. So if in this case the defendant intentionally assaulted Kessler Wilkerson with his hands, fists or feet, and used such force that under the circumstances that force was likely to cause death and that death directly and naturally and proximately resulted from the use of that force, the defendant would be guilty of murder in the second degree.*
>
> . . . .
>
> "And I instruct you that voluntary manslaughter differs from murder in the second degree in that malice is not an essential element of voluntary manslaughter. Voluntary manslaughter is the intentional, unlawful killing of a human being without malice and without premeditation or deliberation. I have already defined the term 'intentional' for you in connection with my discussion of the crime of murder in the second degree and I will not do so again here because it would simply be repetitious to do so. As in the case of murder in the second degree, it is not essential that there be a specific intent to kill. There must, however, be an intent to do an unlawful act which naturally and directly results in the death of a human being. *So, if the defendant intentionally assaulted Kessler Patterson with his hands, fists or feet, but you do not find beyond a reasonable doubt that the force he used was such that it was likely to cause death under the circumstances, but that death did occur as the direct result of the use of that force, under those circumstances the defendant would be guilty of voluntary manslaughter.*

EXCEPTION. THIS CONSTITUTES DEFENDANT'S EXCEPTION NO. 21.

"Voluntary manslaughter requires an intentional act that directly results in death, but not such an act that under the circumstances appeared likely to cause death.

. . . .

"So I will now discuss with you the crime of involuntary manslaughter.

"I instruct you that if the defendant undertook to act in the place of a parent to Kessler Patterson and in doing so was so grossly careless and negligent in his treatment of the child as to show a wanton and reckless behavior and a total disregard for the rights and safety of the child, although his conduct was not such as to show an utter disregard for human life, and if death directly resulted from that conduct, then he would be guilty of involuntary manslaughter. Mere carelessness or negligence is not enough to carry criminal responsibility but if carelessness or negligence is accompanied by wanton or reckless behavior showing a total disregard for the rights and safety of others, it is culpable negligence, for which one may be criminally responsible.

"The intentional violation of a statute, a law, enacted for the protection of life or limb, is culpable negligence, and if death directly results from the intentional violation of such a statute, of such a law, that is involuntary manslaughter.

"It is the law of this state that if a person providing care for a child under sixteen years of age — that statute may have now been amended to raise it to eighteen years — inflicts physical injury on such child by other than accidental means, he is guilty of the misdemeanor of child abuse. *So if in this case the defendant was providing care for Kessler Patterson, who the evidence tends to show was the child of his wife and who lived with him and his wife and who the defendant's testimony tends to show was his natural child, so if the defendant was providing care for Kessler Patterson and in doing so he intentionally inflicted injury upon that child and the child, Kessler, was under the age of sixteen years, and if his death directly resulted from that injury, the defendant under those circumstances would be guilty of involuntary manslaughter.*"

EXCEPTION. THIS CONSTITUTES DEFENDANT'S EXCEPTION No. 23.

Defendant's argument, more precisely, seems to be that the trial judge failed to distinguish properly the various degrees of homicide for the jury. Defendant argues that the definitions of second degree murder and involuntary manslaughter are "virtually synonymous." He says further that an "intentional act" can never be an element of involuntary manslaughter; and that insofar as the trial judge instructed that such an act could be the basis for both voluntary and involuntary manslaughter, he failed to distinguish properly between these degrees of homicide.

Time and again this Court has had occasion to define the various degrees of homicide prevailing under the common law of our state. Repetition of these definitions must be the beginning of our analysis. We find *State v. Wrenn*, 279 N.C. 676, 185 S.E. 2d 129 (1971), particularly helpful. Defendant in *Wrenn* shot his wife to death with a shotgun. The state's evidence was sufficient to support a verdict of either first or second degree murder. These alternatives and not guilty were the only permissible verdicts given by the trial judge. The question on appeal was whether the defendant's evidence, which tended to show an accidental discharge of the gun, was sufficient if believed to support, and therefore require, an instruction on involuntary manslaughter. A majority of the Court thought that it was. Justice, now Chief Justice, Sharp disagreed and dissented. It is apparent, however, that her disagreement with the majority centered on the application of the law of homicide to the facts—not on the legal principles to be applied. Thus, both the majority and dissenting opinions are helpful elucidations of the law of homicide and directly applicable to the facts in the present case.

Justice Huskins, writing for the majority in *Wrenn*, set out our time-honored definitions of homicide as follows, 279 N.C. at 681-82, 185 S.E. 2d at 132:

"Murder in the first degree is the unlawful killing of a human being with malice and with premeditation and deliberation. G.S. 14-17; *State v. Lamm*, 232 N.C. 402, 61 S.E. 2d 188 (1950). Murder in the second degree is the unlawful killing of a human being with malice but without premeditation and deliberation. *State v. Foust*, 258 N.C. 453, 128 S.E.

2d 889 (1963). Voluntary manslaughter is the unlawful killing of a human being without malice and without premeditation and deliberation. *State v. Benge*, 272 N.C. 261, 158 S.E. 2d 70 (1967). Involuntary manslaughter is the unlawful killing of a human being without malice, without premeditation and deliberation, *and without intention to kill or inflict serious bodily injury. State v. Foust, supra; State v. Honeycutt*, 250 N.C. 229, 108 S.E. 2d 485 (1959); *State v. Satterfield*, 198 N.C. 682, 153 S.E. 155 (1930)."

Justice, now Chief Justice, Sharp pointed out in her dissent in *Wrenn* that the difference between second degree murder and manslaughter is that malice, express or implied, is present in the former and not in the latter. She wrote, further, 279 N.C. at 686-87, 185 S.E. 2d at 135:

"Malice has many definitions. To the layman it means hatred, ill will or malevolence toward a particular individual. To be sure, a person in such a state of mind or harboring such emotions has actual or particular malice. *State v. Benson*, 183 N.C. 795, 111 S.E. 869. In a legal sense, however, malice is not restricted to spite or enmity toward a particular person. It also denotes a wrongful act intentionally done without just cause or excuse; 'whatever is done "with a willful disregard of the rights of others, whether it be to compass some unlawful end, or some lawful end by unlawful means constitutes legal malice." ' *State v. Knotts*, 168 N.C. 173, 182-3, 83 S.E. 972, 976. It comprehends not only particular animosity 'but also wickedness of disposition, hardness of heart, cruelty, recklessness of consequences, and a mind regardless of social duty and deliberately bent on mischief, though there may be no intention to injure a particular person.' 21 A. & E. 133 (2d Edition 1902). *Accord, State v. Long*, 117 N.C. 791, 798-9, 23 S.E. 431.

"This Court has said that '[m]alice does not necessarily mean an actual intent to take human life; it may be inferential or implied, instead of positive, as when an act which imports danger to another is done so recklessly or wantonly as to manifest depravity of mind and disregard of human life.' *State v. Trott*, 190 N.C. 674, 679, 130 S.E. 627, 629; *State v. Lilliston*, 141 N.C. 857, 859, 54 S.E. 427. In such a situation

'the law regards the circumstances of the act as so harmful that the law punishes the act as though malice did in fact exist.' 1 Wharton, Criminal Law and Procedure § 245 (Anderson, 1957)."

This Court has also said, "[a]n intent to inflict a wound which produces a homicide is an essential element of murder in the second degree," *State v. Williams*, 235 N.C. 752, 753, 71 S.E. 2d 138, 139 (1952), quoted with approval in *State v. Phillips*, 264 N.C. 508, 513, 142 S.E. 2d 337, 340 (1965), and "second degree murder . . . imports a specific intent to do an unlawful act." *State v. Benton*, 276 N.C. 641, 657, 174 S.E. 2d 793, 803 (1970).

Manslaughter is of two kinds — voluntary and involuntary. Generally voluntary manslaughter occurs when one kills intentionally but does so in the heat of passion suddenly aroused by adequate provocation or in the exercise of self-defense where excessive force under the circumstances is employed or where the defendant is the aggressor bringing on the affray. Although a killing under these circumstances is both unlawful and intentional, the circumstances themselves are said to displace malice and to reduce the offense from murder to manslaughter. *See generally State v. Potter*, 295 N.C. 126, 244 S.E. 2d 397 (1978); *State v. Ward*, 286 N.C. 304, 210 S.E. 2d 407 (1974), *death penalty vacated*, 428 U.S. 903 (1976); *State v. Wrenn, supra*, 279 N.C. 676, 185 S.E. 2d 129 (Sharp, J., now C.J., dissenting).

"Involuntary manslaughter is the unintentional killing of a human being without either express or implied malice (1) by some unlawful act not amounting to a felony *or naturally dangerous to human life*, or (2) by an act or omission constituting culpable negligence. *State v. Foust*, 258 N.C. 453, 128 S.E. 2d 889; *State v. Honeycutt*, 250 N.C. 229, 108 S.E. 2d 485; *State v. Satterfield*, 198 N.C. 682, 153 S.E. 155. In *Foust*, it is said that ordinarily an unintentional homicide resulting from the reckless use of firearms 'in the absence of intent to discharge the weapon, or in the belief that it is not loaded, *and* under circumstances *not evidencing a heart devoid of a sense of social duty*, is involuntary manslaughter.' *Id.* at 459, 128 S.E. 2d at 893. (Emphasis added.) When the circumstances do show a heart devoid of a sense of social duty, the homicide cannot be involuntary manslaughter." *State v. Wrenn, supra*, 279 N.C. at 687-88, 185 S.E. 2d at 136

(Sharp, J., now C.J., dissenting); (*Foust* was also quoted with approval on this point by the majority in *Wrenn*, 279 N.C. at 683, 185 S.E. 2d at 133). Culpable negligence as an element of involuntary manslaughter may also arise from the "intentional, wilful or wanton violation of a statute or ordinance, designed for the protection of human life or limb, which proximately results in . . . death." *State v. Cope*, 204 N.C. 28, 31, 167 S.E. 456, 458 (1933); *State v. Jones*, 32 N.C. App. 408, 413, 232 S.E. 2d 475, 478 (1977).

In *State v. Everhart*, 291 N.C. 700, 231 S.E. 2d 604 (1977), the question before the Court was whether a mother who had dropped her infant on the floor shortly after its birth could be found guilty of involuntary manslaughter. Concluding that the evidence in the case would not support a finding of criminal responsibility the Court, in an opinion by Justice Moore, said, 291 N.C. at 702, 231 S.E. 2d at 606:

> "Culpable negligence in the criminal law requires more than the negligence necessary to sustain a recovery in tort. Rather, for negligence to constitute the basis for the imposition of criminal sanctions, it must be such reckless or careless behavior that the act imports a thoughtless disregard of the consequences of the act or the act shows a heedless indifference to the rights and safety of others."

Applying these principles to the instructions under consideration, we conclude: (1) It was error to instruct that "second-degree murder may . . . exist where there is no intentional act," but that when this expression is considered in context of the entire instruction on this point, the jury could not have been misled by it and no prejudice to defendant resulted. (2) The instructions on murder in the second degree and involuntary manslaughter are, otherwise, correctly stated and properly differentiate these crimes. (3) The instructions on voluntary manslaughter should not have been given since this offense was not supported by the evidence, but the giving of these instructions could not have prejudiced defendant.

[5, 6]   While an intent to kill is not a necessary element of second degree murder, the crime does not exist in the absence of some intentional act sufficient to show malice and which proximately causes death. *State v. Wrenn, supra*, 279 N.C. 676, 185 S.E. 2d 129 (Sharp, J., now C.J., dissenting); *State v. Benton, supra*, 276 N.C.

641, 174 S.E. 2d 793; *State v. Phillips, supra,* 264 N.C. 508, 142 S.E. 2d 337; *State v. Williams, supra,* 235 N.C. 752, 71 S.E. 2d 138. We question the universal applicability of the statements in *Williams,* quoted in *Phillips,* that "an intent to inflict a wound which produces a homicide is an essential element of murder in the second degree," and in *Benton* that "second-degree murder . . . imports a specific intent to do an unlawful act." It is more fundamentally sound to say, as did Justice, now Chief Justice Sharp in her dissent in *Wrenn,* that any act evidencing "wickedness of disposition, hardness of heart, cruelty, recklessness of consequences, and a mind regardless of social duty and deliberately bent on mischief, though there may be no intention to injure a particular person" is sufficient to supply the malice necessary for second degree murder. Such an act will always be accompanied by a general intent to do the act itself but it need not be accompanied by a specific intent to accomplish any particular purpose or do any particular thing.

[7, 8] Here, the trial judge instructed the jury that second degree murder could exist "where there is no intentional act." This, taken out of context, is as we have shown a misstatement of the law. In context, however, the judge seems to be using this phrase in the sense of a specific intent to kill. All the evidence showed that the *acts* committed by defendant against the child were intentional, whatever might have been defendant's intent regarding the *result* of those acts. The trial judge correctly charged the jury on the necessity to find this general intent when he said in the next sentence, "so if in this case the defendant *intentionally assaulted* Kessler Wilkerson. . . ." (Emphasis supplied.) He further charged the jury that in order to return a verdict of guilty of second degree murder, it had to find "an act of culpable negligence which causes danger to another and the act is so recklessly or wantonly done as to indicate *a total disregard for human life.* . . ." (Emphasis supplied.) Considered in its entirety, the instruction properly informed the jury of the elements necessary for a conviction. An act that indicates a total disregard for human life is sufficient to supply the malice necessary to support the crime of second degree murder. *State v. Wrenn, supra,* 279 N.C. at 687, 185 S.E. 2d at 135 (Sharp, J., now C.J., dissenting). The jury thus could not have been misled to defendant's prejudice by the erroneous instruction on the absence of an "intentional act."

[9]   The trial judge was correct in the distinction he drew between involuntary manslaughter and second degree murder. Both can involve an act of "culpable negligence" that proximately causes death. Culpable negligence, standing alone, will support at most involuntary manslaughter. When, however, as the judge here instructed, an act of culpable negligence also "imports danger to another [and] is done so recklessly or wantonly as to manifest depravity of mind and disregard of human life," it will support a conviction for second degree murder. *Id., quoting State v. Trott*, 190 N.C. 674, 679, 130 S.E. 627, 629 (1925).

[10]   Next, while involuntary manslaughter imports an unintentional killing, i.e., the absence of a specific intent to kill, it is, notwithstanding defendant's argument to the contrary, accomplished by means of some intentional act. Indeed without some intentional act in the chain of causation leading to death there can be no criminal responsibility. Death under such circumstances would be the result of accident or misadventure. *State v. Everhart*, supra, 291 N.C. 700, 231 S.E. 2d 604; *State v. Church*, 265 N.C. 534, 144 S.E. 2d 624 (1965).

[11]   An intentional violation of some statute designed for the protection of people which proximately though unintentionally causes death can support a conviction of involuntary manslaughter. *State v. Cope, supra*, 204 N.C. 28, 167 S.E. 456. It is clear in this case that when the trial judge instructed the jury that if defendant while caring for the child "intentionally inflicted injury upon that child . . . under the age of sixteen years, and if his death directly resulted . . . defendant . . . would be guilty of involuntary manslaughter" he was referring to just such a violation of General Statute 14-318.2 which provides:

"Child abuse a general misdemeanor. — (a) Any parent of a child less than 16 years of age, or any other person providing care to or supervision of such child, who inflicts physical injury, or who allows physical injury to be inflicted, or who creates or allows to be created a substantial risk of physical injury, upon or to such child by other than accidental means is guilty of the misdemeanor of child abuse.

"(b) The misdemeanor of child abuse is an offense additional to other civil and criminal provisions and is not intended to repeal or preclude any other sanctions or remedies, and is punishable as provided in G.S. 14-3(a)."

[12, 13]   Finally, we note that the trial judge should not have instructed the jury on voluntary manslaughter. There is, in this case, no evidence to support such a verdict. There is no evidence that defendant killed under the heat of passion raised by sudden provocation and nothing that raises the issue of self-defense. Where there is no evidence of a killing under such circumstances a possible verdict of voluntary manslaughter should not be submitted. *State v. Ward, supra,* 286 N.C. 304, 210 S.E. 2d 407. The trial judge charged the jury that if defendant "intentionally assaulted Kessler Patterson with his hands, fists or feet, but you do not find beyond a reasonable doubt that the force he used was . . . likely to cause death . . . but that death did occur as the direct result of the use of that force . . . defendant would be guilty of voluntary manslaughter." The instruction is incorrect. Such a state of facts would render defendant guilty at most of involuntary manslaughter. If the assault were committed under such circumstances as to indicate a total disregard for human life, it would support a finding of implied malice and a verdict of second degree murder, as the judge earlier so instructed and the jury apparently so found. It follows from what we have already said, however, that a mere assault which proximately results in death, but which does not indicate a total disregard for human life and is committed with no intent to kill or to inflict serious bodily injury, will support, at most, a verdict of involuntary manslaughter.

Since defendant was convicted of second degree murder, he could not have been prejudiced by the erroneous submission of voluntary manslaughter, a lesser included offense not raised by the evidence. *State v. Accor,* 281 N.C. 287, 188 S.E. 2d 332 (1972); *State v. Rogers,* 273 N.C. 208, 159 S.E. 2d 525 (1968). If anything, the error was in defendant's favor. It gave the jury an opportunity, which legally the jury should not have had, to find defendant guilty of a lesser offense.

No error.

Justice BRITT took no part in the consideration or decision of this case.