STATE OF NORTH CAROLINA v. MARGARET CATHERINE MAPP

No. 7910SC824

(Filed 18 March 1980)

1. **Homicide § 21.7— abused child—second degree murder—sufficiency of evidence**

    Evidence in a second degree murder prosecution was sufficient for the jury to find that the victim died from other than natural causes and to find that defendant was culpably negligent and such negligence was the cause of the victim's death where the evidence tended to show that the victim was defendant's five-year-old daughter; the child's death resulted from suffocation caused by a blood clot from a wound in her mouth; the child suffered from the "battered child syndrome"; and the child was in defendant's care at all times.

2. **Parent and Child § 2.2— child abuse—sufficiency of evidence**

    Evidence was sufficient for the jury in a prosecution for child abuse where the evidence tended to show that defendant was the mother of the child in question and the child was less than 16; a physician testified that the child suffered from "battered child syndrome"; and the doctor based his opinion on the totality of evidence regarding the child's injuries. G.S. 14-318.2(a).

3. **Parent and Child § 2.1— neglect of child—sufficiency of evidence**

    Evidence was sufficient for the jury in a prosecution for child neglect where it tended to show that defendant was the mother of the child in question who was less than 16; the child had numerous broken bones which had not been treated and a staph infection in the knees, lungs and scalp; and defendant admitted that she was not aware of any broken bones or infection and did not seek medical treatment for any of the child's injuries. G.S. 14-316.1.

4. **Homicide § 23.1— jury instructions—second degree murder and involuntary manslaughter—culpable negligence**

There was no merit to defendant's contention that there must be different definitions of culpable negligence for involuntary manslaughter and second degree murder, and the trial judge made it clear that culpable negligence evidencing malice must be found before there could be a conviction for second degree murder.

5. **Parent and Child § 2.2; Homicide § 5— second degree murder—abuse and neglect of child not lesser offenses**

Charges of child abuse and child neglect were not merged into the charge of second degree murder, since second degree murder does not require that the victim be under 16 years of age or that the injury be inflicted by the child's custodian, as do the offenses of child abuse and neglect, and since the abuse and neglect occurred over many months and there were many separate acts of abuse and neglect which by themselves were not the proximate cause of the child's death.

6. **Criminal Law § 53— medical expert testimony**

Where a doctor had been qualified as a medical expert and had conducted the autopsy on the homicide victim, he could testify directly as to his opinion without first stating that his opinion was satisfactory to himself or based upon a reasonable degree of medical certainty.

APPEAL by defendant from *Braswell, Judge.* Judgment entered 23 April 1979 in Superior Court, WAKE County. Heard in the Court of Appeals 30 January 1980.

The defendant was convicted of murder in the second degree, child abuse, and child neglect. For the conviction of murder in the second degree, the defendant was sentenced to a term of 25 years in a State prison. For each of the convictions of child abuse and child neglect, the defendant received a two-year sentence. The two-year sentences were to run concurrently with the 25-year term.

The State's evidence tended to show that defendant's sister arrived at defendant's home on the night of 21 November 1977 and observed defendant giving mouth to mouth resuscitation to defendant's five-year-old daughter. Defendant corroborated her sister's testimony later, saying that she fed the child and put her to bed around 7:00 p.m. When defendant checked on the child later in the evening, she thought the child was having a seizure. It was at this point that defendant attempted mouth to mouth resuscitation. An ambulance and the police were summoned, and the child was determined to be dead.

The young child, Margaret Catherine Spence, was born prematurely and was considered to be retarded, or at least developmentally slow. In January, 1975 she functioned as a child of 19 to 20 months rather than a child of 36 months. In May, 1977 she functioned as a child of three to three and one-half years although she was four years and eleven months old. At the time of her death, when the child was five years old, she still was considered to be developmentally slow, although she was able to play with other children in the neighborhood regularly.

Dr. Laurin Kaasa, medical examiner for Wake County, testified that he conducted an autopsy on the deceased child. The doctor's findings indicated that the child's face had a mottled appearance. There were areas of depigmentation on the face, cuts about the cheek and beneath the eye, an abrasion under the chin, and several abraded areas on the forehead and in the cheek and mouth area. Dr. Kaasa found swelling in the knees, feet and hands, multiple linear scars on the child's back, and an ovoid scar on the right hip. The right arm could not be extended more than 165 degrees, and an examination of the arm joint showed a calcified area resulting from a prior injury and bleeding into the soft tissues. The left elbow joint was swollen. There was an open sore on the inside of the left knee, sores and a depigmented area on the right leg resulting from previous injuries, and areas of depigmentation in a linear groove around the left ankle, which resulted from a cord being wrapped around the ankle. A loose blood clot, which formed as the result of a blunt force injury, was found beneath the scalp on the back of the child's head, and the child's lips were swollen and contained lacerations. The ninth rib on each side of the back had been fractured by an injury or trauma of considerable force. Blood tests performed by Dr. Kaasa indicated that a staph infection existed in the knee, lungs and scalp area. The doctor concluded that the child had been suffering from blood poisoning of several days' duration due to the entry of bacteria through different wounds and that the poisoning had localized in the joints of the knees. He indicated that the child had been in a weak, moribund state and unable to walk because of the infection in her knees. Dr. Kaasa indicated that the staph infection was lethal and that death would have followed within several days without treatment, but that instead ". . . the final insult was the aspiration, the swallowing of a clot from bleeding

in the mouth which lodged in her voice box and in her trachea and resulted in lack of oxygen going to her lungs, the state of anoxia, from which she expired." The doctor indicated that a person in a healthy state could dislodge or cough up material in the windpipe and that the wound inside the mouth which caused the bleeding was the result of trauma or injury.

The testimony of radiologist, Dr. Julius Green, provided more evidence of the child's injuries. He testified that x-rays of the child's right leg were normal. X-rays of the left leg revealed fractures of the femur, tibia and fibula, which were the result of severe injury or trauma. Dr. Green testified that the fractures did not occur at the same time. Despite the severity of the left leg fractures, Dr. Green found that no treatment was evidenced by the x-rays and that medical attention would have been needed for the fractures to heal properly. X-rays of the left arm indicated fractures of the humerus and radius and a fracture of the fifth finger. Dr. Green offered no opinion as to evidence of treatment. X-rays of the right arm indicated fractures of the humerus, olecranon process and distal ulna, which were caused by severe injury or trauma. In Dr. Green's opinion, no treatment had been sought for the injuries. On cross-examination, Dr. Green admitted that fractures could occur during a seizure, although he had not seen limb fractures as the result of seizure.

The State also presented the testimony of a pediatrician and expert in child abuse, Dr. Ronald Kinney. In response to a hypothetical question, Dr. Kinney testified that the deceased child was a victim of the "battered child syndrome." Dr. Kinney defined the term as encompassing nonaccidental injuries perpetrated by a child's caretaker.

Karen Alexander, an employee with the Pennsylvania Children's Aid Society, gave a history of the child. She testified that pursuant to court order the deceased child was placed in a foster home from June, 1975 through June, 1976. The child had been living in Philadelphia with defendant and her grandmother for several months up until that time. The child was returned to the defendant in June, 1976, and Ms. Alexander followed the child's progress in the home until December, 1976 when the family moved from Philadelphia. When Ms. Alexander first observed the child, she noted some scars, but no open wounds. She in-

dicated the child's physical condition was good during the entire period. She was not aware of any injuries sustained by the child while in the foster home.

The foster mother, Amanda Ferguson, testified that the child did not sustain any injuries while in her care although she had three seizures during a two-day period in May, 1976. Ms. Ferguson stated that she took the child to a hospital where she received a prescription for phenobarbital, a drug used to control seizures. She indicated that when she last saw the child in December, 1976 there was no depigmentation, cuts, nor abrasions on the child's face. At the close of State's evidence, defendant's motion for nonsuit was denied.

The defendant testified that the deceased child had suffered from seizures since she was three months old and that the child fell frequently while playing. Defendant stated that the child lost pigmentation on her face when the child accidentally spilled hot tea on herself. As a result of the accident, defendant's husband obtained an ointment from the pharmacy to apply to the child's face. Defendant stated that, contrary to the doctor's testimony, the child was walking on the day she died.

Defendant further testified that she was not aware of the presence of broken bones or infection in the child's knees. Defendant maintained the child hurt her knees while playing on a swing and testified that she treated the child's knees by soaking them in Epsom salts and by bandaging them. Defendant maintained that the child cut her chin while playing on monkey bars and that the circular scar around the child's ankle was the result of being hurt while on a swing. Defendant acknowledged that the child did not see a doctor while living in Raleigh.

Defendant's husband, Charles Mapp, was called as a witness, at which time the court declared a mistrial as to him. The husband corroborated defendant's testimony that the child's injuries were suffered in accidents. Defendant's renewed motion for nonsuit was overruled.

Defendant appealed.

State v. Mapp

*Attorney General Edmisten, by Special Deputy Attorney General Isaac T. Avery III, for the State.*

*Hatch, Little, Bunn, Jones, Few & Berry, by E. Richard Jones, Jr., and McDaniel & Heidgerd, by C. Diederich Heidgerd, for defendant appellant.*

HILL, Judge.

The defendant contends in her first assignment of error that the trial court erred in denying defendant's motion for nonsuit as to all charges against her. We disagree.

Upon a motion for nonsuit in a criminal case, the court must consider the evidence in the light most favorable to the State. All contradictions and discrepancies must be resolved in the State's favor, and it must be given the benefit of every reasonable inference to be drawn from the evidence. *State v. Yellorday*, 297 N.C. 574, 578, 256 S.E. 2d 205 (1979); *State v. Cutler*, 271 N.C. 379, 382, 156 S.E. 2d 679 (1967).

[1] The defendant was charged and convicted on three counts: murder in the second degree, child abuse, and child neglect. We deal first with the charge of murder in the second degree. Murder in the second degree is defined as ". . . the unlawful killing of a human being with malice, but without premeditation and deliberation." *State v. Duboise*, 279 N.C. 73, 81, 181 S.E. 2d 393, 398 (1971). Defendant contends that the State has produced insufficient evidence to prove that the child actually died of anything other than natural causes.

Dr. Kaasa testified that the proximate cause of the child's death was ". . . the swallowing of a clot from bleeding in the mouth which lodged in her voice box and in her trachea . . . ." The obstruction blocked the flow of oxygen to the lungs, and the child suffocated. The doctor testified that a healthy person could have coughed up the clot.

The child was not healthy. There was extensive testimony regarding the extent of the child's injuries and testimony to the effect that many of the injuries could have only been caused by physical abuse. Open lacerations, depigmented areas, numerous broken bones, blood clots beneath the scalp, and blood poisoning were all discovered by Dr. Kaasa during his autopsy. "[T]he act of

the accused need not be the immediate cause of the death. He is legally accountable if the direct cause is the natural result of his criminal act." *State v. Minton*, 234 N.C. 716, 722, 68 S.E. 2d 844 (1952). We find there was sufficient evidence that the child died of other than natural causes to withstand nonsuit.

Defendant contends there was no showing of malice. Malice does not necessarily mean an actual intent to take a human life. It may be inferred or implied as ". . . when an act which imports danger to another is done so recklessly or wantonly as to manifest depravity of mind and disregard of human life." *State v. Trott*, 190 N.C. 674, 679, 130 S.E. 627, 629 (1925). Thus, culpable negligence from which death proximately results can, under some circumstances, make the actor guilty of murder. *State v. Phelps*, 242 N.C. 540, 544, 89 S.E. 2d 132 (1955). The very extent and severity of the physical abuse in this case are of such magnitude that malice may be implied. *See State v. Vega*, 40 N.C. App. 326, 333, 253 S.E. 2d 94, *cert. denied* and *appeal dismissed* 297 N.C. 457 (1979).

The mere proof of culpable negligence, however, does not establish proximate cause. To hold a person criminally responsible for a killing, there must be evidence that the act constituting culpable negligence was a proximate cause of the death. *State v. Roop*, 255 N.C. 607, 610, 122 S.E. 2d 363 (1961). Defendant contends that the State failed to show that defendant's acts proximately cause the death.

Defendant argues that in cases previously before this Court in which the "battered child syndrome"—a sociological term which sums up the case *sub judice*—was addressed, there was direct evidence of physical abuse. In those cases, someone actually saw the defendants physically assault the abused child. *See State v. Fredell*, 283 N.C. 242, 195 S.E. 2d 300 (1973); *State v. Periman*, 32 N.C. App. 33, 230 S.E. 2d 802 (1977); *State v. Vega*, *supra*.

No such direct evidence is available in the case *sub judice*. Child abuse of the magnitude that caused this child's death is not the sort of act that is done openly. It is a surreptitious act. Hence, circumstantial evidence must be relied upon to prove the fact.

"When the motion for nonsuit calls into question the sufficiency of circumstantial evidence, the question for the court is whether a reasonable inference of defendant's guilt may be drawn from the circumstances. If so, it is for the jury to decide whether the facts, taken singly or in combination, satisfy them beyond a reasonable doubt that the defendant is guilty." (Citation omitted.) *State v. Cook*, 273 N.C. 377, 383, 160 S.E. 2d 49 (1968).

The State introduced evidence which showed that defendant's opportunity to work or be out of the house was limited because of the deceased child's mental retardation. The child was in defendant's custody during the whole day, every day. Although defendant's husband had access to the child also, there is evidence from the foster mother that the deceased child was scarred prior to the relationship between defendant and her husband, whom she married in 1975.

Based upon all the facts before the Court, there is sufficient evidence reasonably to infer defendant's guilt. A jury could find that the blood clot was caused by the culpable negligence or wilful acts of the defendant, and that further culpable negligence or wilful acts weakened the child so that the weakened state, combined with the clot, resulted in the death of the child. The charge of murder in the second degree was properly submitted to the jury.

[2] Defendant contends that her motion for nonsuit on the charge of child abuse should have been granted. The offense of child abuse arises when:

'Any parent of a child less than 16 years of age, or any other person providing care to or supervision of such child, who inflicts physical injury, or who allows physical injury to be inflicted, or who creates or allows to be created a substantial risk of physical injury, upon or to such child by other than accidental means is guilty of the misdemeanor of child abuse.'

*State v. Fredell, supra,* at p. 244.

G.S. 14-318.2(a) provides for three separate offenses: "If the parent by other than accidental means (1) inflicts physical injury upon the child, (2) allows physical injury to be inflicted upon the

child, or (3) creates or allows to be created a substantial risk of physical injury." *Fredell* at 244.

The evidence clearly shows that defendant was the mother of the child and the child was less than 16 years of age. Dr. Ronald Kinney, a physician with a specialization in treating abused children, testified for the State. The doctor stated that the deceased child was the victim of the "battered child syndrome"; that the term meant that the child had suffered nonaccidental injuries; and that the injuries were caused by the child's custodian. The doctor based his opinion on the totality of evidence regarding the child's injuries. We find that this evidence, together with the circumstantial evidence of defendant's responsibility for the child's injuries, when taken in the light most favorable to the State, is sufficient to withstand the motion for nonsuit. *See State v. Wilkerson*, 295 N.C. 559, 569-71, 247 S.E. 2d 905 (1978).

[3] The offense of child neglect, as it existed at the time of the child's death, occurs when:

(a) A parent, guardian, or other person having custody of a child, who omits to exercise reasonable diligence in the care, protection, or control of such child or who knowingly or wilfully permits such child to associate with vicious, immoral, or criminal persons, or to beg or solicit alms, or to be an habitual truant from school, or to enter any house of prostitution or assignation, or any place where gambling is carried on, or to enter any place which may be injurious to the morals, health, or general welfare of such child, and any such person or any other person who knowingly or wilfully is responsible for, or who encourages, aids, causes, or connives at, or who knowingly or wilfully does any act to produce, promote, or contribute to, any condition of delinquency or neglect of such child shall be guilty of a misdemeanor.

G.S. 14-316.1.

The defendant admitted she was the mother of the deceased child. The child was under sixteen years of age. Failure "to exercise reasonable diligence in the care" of the child can be found by the defendant's admission that she "was not aware of any broken bones or infection" as well as her failure to seek medical treatment for the child's other injuries. The evidence is sufficient to withstand defendant's motion for judgment on this charge.

Defendant's first assignment of error is without merit and overruled.

[4] The defendant by her next assignment of error contends that the court erred in its instructions to the jury by inadequately and incorrectly explaining the doctrine of culpable negligence as it relates to the charge of murder in the second degree. A careful reading of the entire charge shows this assignment of error to be without merit.

Both involuntary manslaughter and murder in the second degree can involve an act of culpable negligence that proximately causes death. "Culpable negligence, standing alone, will support at most involuntary manslaughter. When . . . an act of culpable negligence also 'imports danger to another [and] is done so recklessly and wantonly as to manifest depravity of mind and disregard of human life,' it will support a conviction for second degree murder." (Citations omitted.) *State v. Wilkerson, supra,* at 582.

It is elementary that the distinction between manslaughter and murder in the second degree is malice. Therefore, culpable negligence will not support a murder charge unless there are sufficient facts to support a finding of malice. Malice may be implied from the acts of defendant. *State v. McClain,* 240 N.C. 171, 175, 81 S.E. 2d 364, 366 (1954); *Vega, supra,* at 331-32.

Defendant contends, in effect, that there must be "culpable negligence plus" to support a conviction of murder in the second degree and that this must be made clear by the judge in his charge.

The trial judge in his charge to the jury on the elements of murder in the second degree stated that culpable negligence "is also sometimes synonymously called criminal negligence . . . ." Thereafter, the trial judge further instructed the jury that,

The second element which the state must prove beyond a reasonable doubt is that an act of criminal negligence was a proximate cause of Margaret Catherine Spence's death . . . .

Defendant contends that the above language does not adequately cover the proposition of "culpable negligence plus"; that such instructions were so confusing that a new trial should be

given defendant. We do not agree that there must be two defini-tions of culpable negligence—one for involuntary manslaughter and one for murder in the second degree. The distinguishing ele-ment of the two offenses is the requirement of malice in murder in the second degree. The trial judge adequately covered this distinction in his charge, as follows:

> Now, I charge that for you to find the defendant guilty of second-degree murder, the State must prove two things beyond a reasonable doubt. First, that the defendant inten-tionally and with malice did commit an act of criminal culpable negligence which caused danger to Margaret Catherine Spence and which was so reckless or wantonly done as to indicate a total disregard for human life.

> *     *     *     *

> Malice means hatred, ill will or spite. Also, any action evi-dencing wickedness of disposition, hardness of heart, cruelty, recklessness of consequences and a mind, regardless of social duty, deliberately bent on mischief.

The trial judge made it clear that culpable negligence evidencing malice must be found before a conviction for murder in the second degree could be had. Defendant's assignment of error is without merit and is overruled.

Next, the defendant contends the court erred in its instruc-tion to the jury by inadequately and incorrectly explaining the doctrine of culpable negligence as it relates to involuntary manslaughter. The trial court charged the jury correctly, and this assignment of error is overruled.

Neither are we impressed with defendant's third assignment of error where it is argued that the trial court erred in entering judgment in the misdemeanor convictions for child neglect and child abuse on the ground that the superior court lacked jurisdic-tion. *State v. Vega, supra,* resolves the issue and expressly per-mits such joinder. *See* G.S. 15A-926.

[5] Defendant contends in her fourth assignment of error that error was committed by the trial judge when he entered judg-ment in the misdemeanor convictions for child neglect and child abuse for the reason that the charges merged into and became a

part of the charge of murder in the second degree. The elements of murder in the second degree and the elements of child abuse and child neglect are different.

A conviction for murder in the second degree does not require the victim to be a child under 16 years of age or that the person guilty of the murder be providing care to or supervision of such child. These elements are distinct and independent of those elements which constitute murder in the second degree.

In addition, subsection (b) of G.S. 14-318.2 states:

The misdemeanor of child abuse is an offense additional to other civil and criminal provisions and is not intended to repeal or preclude any other sanctions or remedies, and is punishable as provided in G.S. 14-3(a).

The General Assembly apparently did not intend child abuse to be a lesser included offense or to merge with any other offense. While the General Assembly cannot, by statute, repeal the double jeopardy provisions of the Constitution, in this situation the double jeopardy clause does not require merger.

The elements constituting child neglect do not appear in the murder offense either. The murderer does not have to be a parent, guardian, or other person standing in loco parentis to a child under 16 years of age, and does not have to fail to exercise reasonable diligence in the care and protection or control of such child.

It is true that the offense of murder in the case *sub judice* arose out of the parent-child relationship. It is not true, however, that the same acts which gave rise to the murder also gave rise to the child neglect and child abuse offenses. There is ample evidence that abuse and neglect occurred over many months. There is also ample evidence that there were many separate acts of child abuse or child neglect which by themselves were not the proximate cause of the child's death. The defendant's assignment of error is without merit and is overruled.

[6] Defendant further assigns as error the trial judge's admission into evidence of opinion testimony by medical expert Dr. Kaasa on the grounds that the doctor failed to state that his opinion was "satisfactory to himself" or based upon "a reasonable

degree of medical certainty." Dr. Kaasa had stated that in his opinion the linear scars, the ovoid scar and the depigmented areas on the child's back were evidence of an old injury.

We note first that the doctor had testified to the same effect earlier without objection. In short, there are many instances where Dr. Kaasa states that he is giving his opinion, both prior to and after the defendant's objection.

> The well established rule in this State is that 'when incompetent evidence is admitted over objection, but the same evidence has theretofore or thereafter been admitted without objection, the benefit of the objection is ordinarily lost . . . .'

*State v. Van Landingham*, 283 N.C. 589, 603, 197 S.E. 2d 539 (1973). More importantly, though, we hold that Dr. Kaasa's testimony was competent. The doctor had been qualified as a medical expert, and he had conducted the autopsy. "Where an expert witness testifies as to facts based upon his personal knowledge, he may testify directly as to his opinion." (Citations omitted.) *Cogdill v. Highway Comm.* and *Westfeldt v. Highway Comm.*, 279 N.C. 313, 326, 182 S.E. 2d 373 (1971).

We have examined defendant's remaining assignments of error and find them to be without merit.

No error.

Chief Judge MORRIS and Judge MARTIN (Harry C.) concur.