STATE OF NORTH CAROLINA v. SHERALD BERNIE QUALLS

No. COA97-702

(Filed 7 July 1998)

**1. Indictment and Information— variance—child abuse— nature of injury—surplusage**

The trial court did not err by not dismissing a charge of felonious child abuse based on an alleged fatal variance between the indictment and the evidence where the indictment alleged that the victim suffered a subdural hematoma and the evidence tended to show an epidural hematoma. The indictment alleged the elements of the crime and the reference to a subdural rather than an epidural hematoma was surplusage and properly disregarded.

**2. Minors— felonious child abuse—sufficiency of evidence**

The trial court did not err by denying defendant's motion to dismiss a charge of felonious child abuse where the court noted that there was medical testimony of an intentional injury and that defendant had sole and exclusive care and custody of the child for some periods during the day during that time.

**3. Homicide— second-degree murder—child abuse—sufficiency of evidence**

The trial court did not err by not dismissing a second-degree murder charge based upon insufficient evidence where defend-

1

ant contended that evidence that he may have shaken the two-month-old child in an attempt to rouse him was insufficient to show malice, but there was medical testimony that the child's injuries were consistent with shaken baby syndrome, and there was other medical evidence of defendant previously inflicting a severe blow to the victim's head.

### 4. Criminal Law— mistrial denied—reference to polygraph

The trial court did not abuse its discretion in a prosecution arising from the death of a two-month-old child by not declaring a mistrial after a taped interview was played for the jury which contained a reference to defendant taking a polygraph and the court took curative measures. The decision is within the discretion of the court and every reference to a polygraph does not necessarily result in prejudicial error.

Judge GREENE dissenting.

Appeal by defendant from judgment entered 27 September 1996 by Judge Gregory A. Weeks in Cumberland County Superior Court. Heard in the Court of Appeals 17 March 1998.

*Attorney General Michael F. Easley, by Assistant Attorney General Elizabeth Leonard McKay, for the State.*

*Appellate Defender Malcolm Ray Hunter, Jr., by Assistant Appellant Defender Charlesena Elliott Walker, for defendant-appellant.*

WALKER, Judge.

Defendant was charged with felonious child abuse and second degree murder following the death of his two-month-old son (the victim). The evidence presented at trial tended to show the victim was born on 29 January 1993. From that date until March of 1993, defendant and his wife took the victim to the doctor on several occasions complaining of irritability and feeding problems. About a week after the victim was born, defendant's wife returned to work and defendant was the primary caretaker. Defendant had recently been released from the military and was collecting unemployment compensation while seeking new employment.

On 15 March 1993, the victim's pediatrician, Dr. James S. Hall, admitted the victim to Cape Fear Valley Hospital in Fayetteville when defendant and his wife complained the victim was irritable, not eat-

ing well, and had a slight fever. Dr. Hall conducted a spinal tap in order to rule out the possibility of septicemic meningitis, which is an inflammation of the membranes protecting the brain and spinal cord caused by the presence of disease-causing bacteria in the blood-stream. This procedure, which is accomplished by inserting a needle into the cerebral spinal cord and drawing some spinal fluid, proved unremarkable, although Dr. Hall did discover a small amount of blood in the fluid. Dr. Hall dismissed this finding as simply an error in insert-ing the needle into a vein alongside the spinal cord rather than an internal injury and discharged the victim from the hospital on 17 March 1993. Thereafter, either Dr. Hall or one of his colleagues saw the victim on 19 March 1993, 22 March 1993 and 24 March 1993 for similar symptoms but found no significant physical problems.

On 26 March 1993, defendant was home alone with the victim and the victim's four-year-old sister when, according to defendant, "all of a sudden, [the victim] started gagging, and stuff was all coming from his nose and mouth." Defendant stated he then called his wife at work to tell her to come home, and when she arrived, they called 911 for emergency assistance. When the ambulance arrived, the victim was transported to Cape Fear Valley Hospital and was then flown to UNC Memorial Hospital in Chapel Hill (UNC Hospital), where he was admitted to the pediatric intensive care unit.

Dr. Paul C. Tobin, a resident in the pediatric intensive care unit of UNC Hospital, saw the victim when he arrived on 27 March 1993. Dr. Tobin testified that upon his arrival, the victim was not breathing and was receiving full life support. The victim was not exhibiting any involuntary reflexes, such as blinking and gagging, which indicated there was no brain activity at that time. There was also evidence of brain swelling. A bulging soft spot on the top of the victim's head indi-cated an increase in pressure on the brain. Further, Dr. Tobin observed a possible sheering of the blood vessels in the victim's eyes behind the retinas.

In addition, Dr. Tobin ordered x-rays and a CAT scan of the vic-tim's head, which revealed a skull fracture possibly caused by a blunt trauma to the head. There was also evidence of a previous head injury due to an older collection of blood in the brain. Dr. Tobin testified that the prior head injury could have caused the victim to be more irritable or fussy and might have also caused the victim to feed poorly or spit up more often. As a result of his examination of the victim, Dr. Tobin concluded as follows:

STATE v. QUALLS

[130 N.C. App. 1 (1998)]

[T]here [are] a number of findings on [the victim's] exam . . . that are consistent with a shaking type injury, one of the most remarkable of those being that the hemorrhages, or bleeding, that was seen . . . in the back of . . . the eye or on the retina.

When . . . an infant's head is shaken, or forcefully accelerated and decelerated, there can be sheering of the blood vessels that line the back of the eye, and that can cause little blood spots that you can see with . . . what we call an opthalmoscope to look in the back of the eye.

That, along with the evidence of head trauma and the fractures that were seen on a brain scan and swelling of the brain, taken together, were evidence that . . . this baby had suffered a severe injury and possibly some shaking to cause that swelling and those findings.

Dr. Desmond Runyan, a pediatrician on staff at UNC Hospital, consulted with Dr. Tobin regarding the victim's injuries. After viewing the victim's charts and x-rays and conducting an examination of the victim, Dr. Runyan opined it was likely that when the victim was taken to Cape Fear Valley Hospital on 15 March 1993, "there had been an original episode of injury that had happened that had been misdiagnosed or had been thought to be [septicemic meningitis] when, in fact, the real explanation was that this child had been injured."

Dr. Runyan further testified that in his opinion the victim had suffered two distinct injuries. First, the victim suffered an epidural hematoma, which is a blood clot between the outer membrane surrounding the brain and spinal cord and the inner surface of the skull, when his skull was fractured about the time of the first hospitalization on 15 March 1993. According to Dr. Runyan, this type of injury may have caused the victim to become very irritable, to experience increased, inconsolable crying from pain, and to have poor feeding habits. Next, the victim suffered a subdural hematoma, which is a blood clot beneath the outer membrane surrounding the brain and spinal cord, as a result of an injury suffered about 26 March 1993. Dr. Runyan determined that this injury was "not an accidental injury," and was most likely caused by "violent shaking, back and forth." Further, Dr. Runyan stated that "the hemorrhages behind the eyes in [the victim] that were also found are further evidence of that shaking."

On 29 March 1993, after receiving a report of suspected child abuse from a social worker at UNC Hospital, Linda Parlett (Parlett), a child protective services investigator, met with defendant and his wife at their home. During her initial interview, defendant denied having done anything to harm the victim. He stated that the victim had a cold and had slept from approximately 11:00 a.m. until 6:00 p.m. on 26 March 1993. Thereafter, when the victim awoke, the defendant aspirated mucus from the victim's nose and then began to feed him. Defendant then attempted to clear the victim's airway. When this did not work, he called his wife at work and asked her to come home. Upon her arrival, defendant called 911 to receive emergency assistance, and with the help of his neighbor, a deputy sheriff, attempted to resuscitate the victim by administering CPR.

However, in an interview with defendant later that day at the Law Enforcement Center, defendant told Parlett that he may have accidentally kicked or tripped on the victim when he was attempting to call 911 for emergency assistance. The next day, Parlett had a telephone conversation with defendant in which defendant advised her that, in addition to possibly kicking or tripping on the victim when he was attempting to call 911 for emergency assistance, he may have also shaken the victim when he was trying to arouse him. However, on 31 March 1993, Parlett again met with defendant at his home, and he denied that he either shook, kicked or tripped on the victim, and refused to talk further with Parlett.

On 29 March 1993, Detective Clifton Massengill of the Cumberland County Sheriff's Department interviewed defendant on two different occasions. During the first interview, defendant denied having any knowledge of how the victim's injuries could have occurred. However, shortly after the first interview was concluded, defendant told Detective Massengill that he wished to continue the interview so that he could change some of his testimony. Thereafter, defendant told Detective Massengill during this second interview that he may have accidentally kicked the victim when he was attempting to call 911 for emergency assistance.[1]

The victim died at UNC Hospital on 30 March 1993 at 6:00 p.m. Dr. Deborah L. Radisch, a forensic pathologist, performed an autopsy on the victim on 31 March 1993. In her autopsy report, she observed a

1. This second interview was tape recorded by Detective Massengill, and was subsequently introduced at trial as State's Exhibit 13. A portion of defendant's interview with Detective Massengill which refers to a polygraph examination taken by defendant is addressed in Section III of this opinion.

subdural hematoma on the left side of the brain, multiple skull fractures on the left side of the head, and retinal hemorrhages in both eyes. Dr. Radisch opined that:

> [T]he cause of death in this case was due to subdural hemorrhage secondary to blunt trauma of the head. The subdural hemorrhage and bilateral retinal hemorrhages are features of this case consistent with shaken baby syndrome, although in this case there is a definite component of blunt traumatic injury of severe degree which has caused the left parietal skull fracture.
>
> The focal areas of resolution of the contusion of the left side of the scalp are consistent with more than one episode of intentionally-inflicted injury.

Further, Dr. Radisch explained shaken baby syndrome as follows:

> [S]haken baby syndrome is used to describe a constellation of findings, either clinical findings or autopsy findings. And the primary components would be subdural hematoma, or blood clot, over part of the brain, combined with retinal hemorrhages, or small areas of bleeding, . . . into the back part of the eyes . . . [that] occurs as a result of violent shaking of a young infant.

The jury returned verdicts of guilty as to the charges of felonious child abuse and second degree murder, which were consolidated for judgment, and defendant was sentenced to a term of 25 years in prison.

I.

Defendant's first two assignments of error deal with the charge of felonious child abuse. At the close of the State's evidence and again at the close of all the evidence, the trial court denied defendant's motion to dismiss the charge of felonious child abuse due to insufficient evidence. On appeal defendant raises two principal assignments of error with regard to the trial court's denial: (1) there was a fatal variance between the indictment and the State's evidence at trial, and (2) the evidence was insufficient to prove beyond a reasonable doubt that defendant inflicted the blow that caused the victim's death.

At the outset, we note that in ruling on a motion to dismiss for insufficiency of the evidence, the trial court must consider "all the evidence . . . in the light most favorable to the State, giving the State the benefit of every reasonable inference and resolving any contradictions in its favor." *State v. Pierce*, 346 N.C. 471, 491, 488 S.E.2d 576,

588 (1997). Further, there must be substantial evidence of every element of the crime charged and that the defendant was the perpetrator of that crime. *State v. Elliott,* 344 N.C. 242, 266-267, 475 S.E.2d 202, 212 (1996), *cert. denied,* —— U.S. ——, 137 L. Ed. 2d 312 (1997). In addition, this Court has held that:

> "When the motion [to dismiss] calls into question the sufficiency of circumstantial evidence, the question for the court is whether a reasonable inference of defendant's guilt may be drawn from the circumstances. If so, it is for the jury to decide whether the facts, taken singly or in combination, satisfy them beyond a reasonable doubt that the defendant is guilty."

*State v. Mapp,* 45 N.C. App. 574, 581, 264 S.E.2d 348, 353 (1980) (citation omitted).

In order to establish felonious child abuse pursuant to N.C. Gen. Stat. § 14-318.4, the State must produce evidence tending to show that: (1) the defendant is a parent or any other person providing care to or supervision to, (2) a child less than 16 years of age, (3) who intentionally inflicts any serious physical injury upon or to the child, (4) or who intentionally commits an assault upon the child, and (5) which results in any serious injury to the child. N.C. Gen. Stat. § 14-318.4(a) (1993); *see also State v. Pierce,* 346 N.C. at 492-493, 488 S.E.2d at 588; *State v. Elliott,* 344 N.C. at 278, 475 S.E.2d at 218-219. Further, our Supreme Court has held that:

> Where an adult has exclusive custody of a child for a period of time and during such time the child suffers injuries which are neither self-inflicted nor accidental, the evidence is sufficient to create an inference that the adult inflicted an injury.

*State v. Perdue,* 320 N.C. 51, 63, 357 S.E.2d 345, 353 (1987) (citations omitted).

[1] As to defendant's first assignment of error, the indictment for felonious child abuse charged that "on or about the 15th day of March, 1993 . . . the defendant . . . unlawfully, willfully and feloniously did intentionally inflict serious physical injury, *to wit:* blunt trauma to the head resulting in [*a subdural hematoma*] to the brain, on [the victim], who was two (2) months old and thus under sixteen (16) years of age." (Emphasis added). In contrast, the State's evidence tended to show that the victim suffered an *epidural hematoma* on or about 15 March 1993 and a *subdural hematoma* on or about 26 March 1993. Based on this inconsistency between the indictment and the State's

evidence, the defendant contends the trial court erred by failing to dismiss the charge of felonious child abuse.

Although "the evidence in a criminal case must correspond with the allegations of the indictment which are essential and material to charge the offense," a variance which is not essential is not fatal to the charged offense. *State v. Simmons*, 57 N.C. App. 548, 551, 291 S.E.2d 815, 817-818 (1982) (citations omitted). Further, if an indictment contains an averment which is not necessary in charging the offense, it may be disregarded as inconsequential. *State v. Lewis*, 58 N.C. App. 348, 354, 293 S.E.2d 638, 642 (1982), *cert. denied*, 311 N.C. 766, 321 S.E.2d 152 (1984).

All that is required to indict a defendant for felonious child abuse is an allegation that the defendant was the parent or guardian of the victim, a child under the age of 16, and that the defendant intentionally inflicted any serious injury upon the child. *See* N.C. Gen. Stat. § 14-318.4(a), *supra*. Here, the indictment appropriately charged the elements of that crime; therefore, the reference to the victim suffering a *subdural hematoma* rather than an *epidural hematoma* was surplusage and was properly disregarded by the trial court. As such, the trial court did not err by denying defendant's motion to dismiss on that basis.

[2] Next, defendant contends the trial court erred by not dismissing the charge of felonious child abuse because the State failed to present sufficient evidence that the defendant was the perpetrator of the crime charged. After considering defendant's argument, the trial court denied the motion and noted that the evidence, viewed in the light most favorable to the State, tended to show:

> [T]hrough the testimony of Dr. Hall, Dr. Torbin . . . and the other doctors who . . . testified in [the] case, that there was the infliction of what, in their opinion, was an intentional injury on or about the time that the child was initially admitted to the hospital on [15 March 1993].
>
> . . .
>
> [That] [t]he doctors who subsequently then examined the child after that, on [26 March 1993 until 30 March 1993] said that the findings, x-ray in particular and other findings, tended to show that the blood seen on or about [15 March 1993, from the spinal tap performed by Dr. Hall] was the result of some trauma to the brain caused at that time. The trauma, in the opin-

ion of the doctors, was not accidentally inflicted but was intentionally inflicted.

[And] that during both time periods in question, the mother worked for some portion of the day and was not in the home and that the [defendant] had sole and exclusive care and custody of the child for some periods of the day.

After a careful review, we conclude the trial court properly determined there was sufficient evidence to support a conviction of felonious child abuse, and this assignment of error is overruled.

II.

[3] Next, defendant contends the trial court erred by failing to dismiss the charge of second-degree murder based on insufficiency of the evidence. Again, we note that in ruling on a motion to dismiss for insufficiency of the evidence, the trial court must consider "all the evidence . . . in the light most favorable to the State, giving the State the benefit of every reasonable inference and resolving any contradictions in its favor." *State v. Pierce*, 346 N.C. at 491, 488 S.E.2d at 588.

In order to convict a defendant of second-degree murder pursuant to N.C. Gen. Stat. § 14-17, the State must produce evidence that the defendant committed an "unlawful killing of a human being *with malice*, but without premeditation or deliberation." *State v. Mapp*, 45 N.C. App. at 579, 264 S.E.2d at 353 (citation omitted and emphasis added). Defendant contends the State failed to prove malice, an essential element of second-degree murder.

In *State v. Wilkerson*, 295 N.C. 559, 247 S.E.2d 905 (1978), our Supreme Court defined malice as follows:

[Malice] comprehends not only particular animosity 'but also wickedness of disposition, hardness of heart, cruelty, recklessness of consequences, and a mind regardless of social duty and deliberately bent on mischief, though there may be no intention to injure a particular person. . . .' '[It] does not necessarily mean an actual intent to take human life; it may be inferential or implied, instead of positive, as when an act which imports danger to another is done so recklessly or wantonly as to manifest depravity of mind and disregard of human life.' In such a situation 'the law regards the circumstances of the act as so harmful that the law punishes the act as though malice did in fact exist.'

*Id.* at 578-579, 247 S.E.2d at 916 (citations omitted). Defendant contends the State's evidence that he may have shaken the victim in an attempt to arouse him is insufficient to support a finding that he acted with malice.

However, in *State v. Hemphill*, 104 N.C. App. 431, 409 S.E.2d 744 (1991), a case factually similar to the case *sub judice*, this Court found sufficient evidence of malice to convict a defendant of second-degree murder. In that case, the defendant was charged with second-degree murder for the death of his four-month-old daughter. The State presented the testimony of the medical examiner who conducted the autopsy of the victim and stated there was a "swelling of the infant's brain, bleeding into the skull around the brain substance, bruises on the brain and hemorrhage in the lungs." *Id.* at 432, 409 S.E.2d at 744. In the medical examiner's opinion, the cause of death was "shaken baby syndrome." *Id.* Further, in his initial statements to the officer investigating the crime, the defendant denied having any knowledge of how the victim died, but later stated that he had shaken the victim about four times because she was throwing up and he thought she was choking. *Id.* at 432-433, 409 S.E.2d at 745. After considering all the evidence, this Court held, consistent with the Supreme Court's definition of malice set forth in *State v. Wilkerson* that:

> The evidence that defendant shook [the victim] as well as the expert testimony that the cause of death was "Shaken Baby Syndrome," which typically results from an infant's head being held and shaken so violently that the brain is shaken inside the skull causing bruising and tearing of blood vessels on the surface of and inside the brain, is sufficient to show that defendant acted with "recklessness of consequences, . . . though there may be no intention to injure a particular person."

*Id.* at 434, 409 S.E.2d at 745 (citation omitted).

Similarly, in this case, the evidence from the medical experts, who examined the victim after he was brought to UNC Hospital on 26 March 1993, can be summed up by Dr. Radisch's testimony that:

> [T]he cause of death in this case was due to subdural hemorrhage secondary to blunt trauma of the head. The subdural hemorrhage and bilateral retinal hemorrhages are features of this case consistent with shaken baby syndrome. . . .

According to this Court's ruling in *State v. Hemphill*, this is sufficient evidence from which the jury could find the defendant acted

with malice by severely shaking the victim, an act which ultimately led to his death.

However, in addition to the evidence that defendant shook the victim shortly before his death, there is also evidence which points to the defendant having previously inflicted a severe blow to the left side of the victim's head. Again referring to Dr. Radisch's testimony, she found that:

> [T]here is a definite component of blunt traumatic injury of severe degree which has caused the left parietal skull fracture.

> The focal areas of resolution of the contusion of the left side of the scalp are consistent with more than one episode of intentionally-inflicted injury.

Considering all this evidence together and giving the State the benefit of all legitimate inferences which may reasonably be drawn therefrom, we find the State presented substantial evidence that the defendant acted with malice. Therefore, the trial court did not err by denying defendant's motion to dismiss the charge of second-degree murder.

## III.

[4] Defendant's next assignment of error concerns the trial court's failure to declare a mistrial after the jury was allowed to hear a reference to a polygraph examination taken by defendant. As previously stated, on 29 March 1993, Detective Massengill conducted two separate interviews of defendant. At the first interview, defendant denied having any knowledge of how the victim's injuries could have occurred. However, later that day, defendant told Detective Massengill that he wished to continue the interview so that he could change some of his statement. This second interview was taped and contained the following exchange:

> [Detective Massengill]  [Y]ou said you'd like to continue with the interview. Uh—is that correct?

> [Defendant]  Yes.

> [Detective Massengill]  Okay. You talked with Lieutenant Parlett *after taking your Polygraph* and you indicated to him, that your story was a little different, from what you previously told us. Can you tell us exactly, in as much detail, what transpired on Friday evening.

(Emphasis added). After this tape was played for the jury, the trial court excused the jury and called the parties' attention to the above-referenced comment made by Detective Massengill regarding defendant's polygraph examination. Defense counsel stated that he had noticed the reference to the polygraph examination, but "since there was no reference to the results of the polygraph nor any reference to any of the questions asked during the course of the polygraph[,] I felt that it was really immaterial." However, after further inquiry by the trial court, defense counsel moved for a mistrial. Thereafter, prior to adjournment for the day, defense counsel withdrew his motion for a mistrial and stated that he would "simply leave the matter up to the Court for such disposition as the Court feels inclined to . . . make."

Following the evening recess, the trial court questioned the defendant about his decision not to move for a mistrial as follows:

COURT: . . . First of all, sir, do you understand that it is your absolute right, personally or through counsel, to move for a mistrial pursuant to [N.C. Gen. Stat. § 15A-1061], which is entitled "mistrial for prejudice to defendant?" Do you understand that right?

DEFENDANT: Yes, sir.

. . .

COURT: All right. Now, do you understand that if you continue to take the position that you do not want to move for a mistrial, that you may waive, or give up, certain appellate rights with regard to this issue?

DEFENDANT: Yes, sir.

. . .

COURT: All right. And what is it that you want to do with regard to any motion for a mistrial at this time made on your behalf?

DEFENDANT: With all due respect to everybody and the Judge, I would rather go ahead on with the trial and get it over with, your Honor.

COURT: All right. Am I correct in understanding that you want to withdraw your motion for a mistrial?

DEFENDANT: Yes, sir.

Thereafter, the trial court brought the jury back into the court-room and instructed them with regards to the polygraph examination reference as follows:

> Now, ladies and gentleman, you will recall that, during the playing of the [tape recorded interview between Detective Massengill and defendant] there was some reference to a polygraph. I instruct you that you are to disregard and you are not to consider in any respect during your deliberations any reference as to a polygraph.

> Now, in that regard, I further instruct you that the Supreme Court of North Carolina has held that polygraph evidence is inherently unreliable and is not admissible in the courts of our state. And, therefore, I again repeat to you and emphasize to you that you are to disregard and you are not to consider at any time during your deliberations any reference in the testimony presented in this case to a polygraph.

Despite the curative measures taken by the trial court, the defendant now contends the trial court erred by not declaring a mistrial because (1) it forced defendant to represent himself on the issue of whether a mistrial should be declared without first inquiring whether defendant was waiving his constitutional right to be assisted by counsel on that issue, and (2) the prejudice to defendant due to the polygraph examination reference was so obvious that the trial court should have ordered a mistrial *sua sponte*.

This Court has previously held that a mistrial should only be granted "when there are such serious improprieties as would make it impossible to attain a fair and impartial verdict" and that this decision is within the sound discretion of the trial court. *State v. Suggs*, 117 N.C. App. 654, 660, 453 S.E.2d 211, 215 (1995) (citation omitted). Further, "every reference to a polygraph test does not necessarily result in prejudicial error." *Id.* (citation omitted).

After careful examination of the record, we find no prejudicial error as a result of the brief reference to the polygraph examination and we overrule this assignment of error.

We have reviewed defendant's final assignment of error and find it to be without merit.

No error.

Judge GREENE dissents.

Judge TIMMONS-GOODSON concurs.

Judge GREENE dissenting.

I disagree with the majority's holding that the evidence is sufficient to support submission to the jury of the felonious child abuse charge and the second-degree murder charge. Otherwise, I agree with the majority.

In ruling on a motion to dismiss, the trial court is "to consider the evidence in the light most favorable to the State," *State v. Earnhardt,* 307 N.C. 62, 67, 296 S.E.2d 649, 652-53 (1982) (citing *State v. McKinney,* 288 N.C. 113, 117, 215 S.E.2d 578, 581-82 (1975)), and determine "whether there is substantial evidence (a) of each essential element of the offense charged, or of a lesser offense included therein, and (b) of defendant's being the perpetrator of the offense," *id.* at 65-66, 296 S.E.2d at 651. Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id.* at 66, 296 S.E.2d at 652 (quoting *State v. Smith,* 300 N.C. 71, 78-79, 265 S.E.2d 164, 169 (1980)). If there is substantial evidence, the motion to dismiss should be denied. *Id.* If the evidence, "however, is sufficient only to raise a suspicion or conjecture as to either the commission of the offense or the identity of the defendant as the perpetrator of it," even though the suspicion so aroused by the evidence is strong, the motion to dismiss should be allowed. *Id.* In making its determination, the trial court is not to consider the defendant's evidence, unless it is favorable to the State. *State v. Jones,* 280 N.C. 60, 66, 184 S.E.2d 862, 866 (1971). When the defendant's evidence does not conflict with the State's evidence, however, it may be used to explain or clarify the evidence offered by the State. *Id.* The State's evidence must be taken as true. *State v. Mize,* 315 N.C. 285, 290, 337 S.E.2d 562, 565 (1985).

### I. Felonious Child Abuse

A parent or any other person providing care to or supervision of a child less than 16 years of age who intentionally inflicts any serious physical injury upon or to the child or who intentionally commits an assault upon the child which results in any serious physical injury to the child is guilty of a . . . felony.

N.C.G.S. § 14-318.4 (1993).

To sustain a conviction for felonious child abuse, the State must prove (1) that the defendant is a parent or caretaker of a child less than sixteen years old and (2) that the defendant "intentionally inflicted a serious physical injury upon the child or intentionally committed an assault resulting in a serious physical injury to the child." *State v. Elliott*, 344 N.C. 242, 278, 475 S.E.2d 202, 218-19 (1996), *cert. denied*, —— U.S. ——, 137 L. Ed. 2d 312 (1997).

In this case, there is no evidence that the defendant "intentionally inflicted a serious physical injury" on his child, because there is no evidence that the defendant struck the blow which caused the skull fracture. Our Supreme Court has held that "[w]here an adult has *exclusive* custody of a child for a period of time and during such time the child suffers injuries which are neither self-inflicted nor accidental, the evidence is sufficient to create an inference that the adult inflicted [the] injury," even though there may not be direct evidence that the adult struck the child. *State v. Perdue*, 320 N.C. 51, 63, 357 S.E.2d 345, 353 (1987) (emphasis added); *see also State v. Campbell*, 316 N.C. 168, 340 S.E.2d 474 (1986) (upholding the defendant's conviction for felonious child abuse where the child was under the defendant's care and supervision "at the time [of the child's] injuries"). The evidence in this case, however, is that the defendant was not the *exclusive* caretaker of his child. The defendant cared for his child while his wife was at work, from approximately 12:00 p.m. until 9:00 p.m. three days per week; a baby sitter was with the child during the hours that the defendant's wife worked two days per week; and both the defendant and his wife were with the child when she was not at work. Because the State's experts testified that there was no way to put an exact date on the occurrence of the skull fracture, there simply is no way to know by any measure of certainty who administered the blow that fractured the child's skull. *See State v. Byrd*, 309 N.C. 132, 305 S.E.2d 724 (1983), *overruled on other grounds by State v. Childress*, 321 N.C. 226, 362 S.E.2d 263 (1987) (reversing conviction of involuntary manslaughter based on violation of a child abuse statute due to insufficient evidence of the identity of the perpetrator where there was no evidence establishing the date of injury to the child and where the evidence revealed that adults other than the defendant had been caring for the child). The evidence in this case only confirms that there was indeed injury to the defendant's child. Because there is no evidence from which a reasonable jury could find that the defendant inflicted the blow that caused the skull fracture, any decision by the jury that the defendant caused this injury can be based on nothing but mere speculation. The trial court

was required to grant the defendant's motion to dismiss and the failure to do so was error. *See State v. Brayboy*, 105 N.C. App. 370, 374, 413 S.E.2d 590, 593, *disc. review denied*, 332 N.C. 149, 419 S.E.2d 578 (1992) (when evidence only raises a conjecture or suspicion that the crime was committed or that the defendant was the perpetrator, the motion to dismiss should be granted).

## II. Second-Degree Murder

Malice is an essential element of second-degree murder. *State v. Lang*, 309 N.C. 512, 524, 308 S.E.2d 317, 323 (1983) ("While an intent to kill is not a necessary element of murder in the second-degree, that crime does not exist in the absence of some *intentional act sufficient to show malice* . . . ." (emphasis added)). The issue, therefore, in this case, is whether the evidence considered in the light most favorable to the State would support, in the mind of a reasonable juror, the conclusion that the defendant killed his child with malice.

> [A]ny act evidencing "wickedness of disposition, hardness of heart, cruelty, recklessness of consequences, and a mind regardless of social duty and deliberately bent on mischief, though there may be no intention to injure a particular person" is sufficient to supply the malice necessary for second degree murder.
>
> . . . An act that indicates a total disregard for human life is sufficient to supply the malice necessary to support the crime of second degree murder.

*State v. Wilkerson*, 295 N.C. 559, 581, 247 S.E.2d 905, 917-18 (1978) (citation omitted). Our Supreme Court has held that malice may be inferred from the "*willful* blow by an adult on the head of an infant." *Perdue*, 320 N.C. at 58, 357 S.E.2d at 350 (emphasis added). "Willful" means "more than intentional." *State v. Fowler*, 22 N.C. App. 144, 147, 205 S.E.2d 749, 751 (1974). It has been defined as "an act being done 'purposely and designedly in violation of the law.'" *State v. Connell*, 127 N.C. App. 685 , ——, 493 S.E.2d 292, 294, *cert. denied*, 347 N.C. 404, 496 S.E.2d 393 (1997), *and disc. review denied*, 347 N.C. 579, —— S.E.2d —— (1998) (quoting *State v. Whittle*, 118 N.C. App. 130, 135, 454 S.E.2d 688, 691 (1995)). Willful means without justification, cause, or excuse. *State v. McCoy*, 304 N.C. 363, 370, 283 S.E.2d 788, 792 (1981); *State v. Davis*, 86 N.C. App. 25, 30, 356 S.E.2d 607, 610 (1987) ("The words 'willful' and 'wanton' have substantially the same meaning when used in reference to the requisite state of mind for a violation of a criminal statute.").

**STATE v. QUALLS**

*[130 N.C. App. 1 (1998)]*

In this case, the State offered evidence showing that the child's death was caused by "subdural hemorrhage secondary to blunt trauma of the head" and that the defendant had been in sole custody of his child for several hours prior to the child's removal to the hospital. The State's evidence also shows that the defendant, just before feeding his child, aspirated mucus from his child's nose and that after the feeding, the child started gagging with food coming from his nose and mouth. The defendant at that time called his wife (who was at work), and when she arrived (some twenty minutes later), he called the 911 operator and requested emergency assistance. Before the arrival of the ambulance, the defendant, with the assistance of a neighbor (a deputy sheriff), attempted to resuscitate his child by administering cardiopulmonary resuscitation. The defendant told a social worker (who testified in court) that he may have accidentally tripped over and kicked his child when he was calling 911, and that he may have shaken his child while trying to "arouse" him. The defendant testified that if he did kick his baby it was accidental, and the defendant told the police that, "I just couldn't face the fact that maybe I was the one that hit him."

Substantial evidence in this case reveals that the defendant's child died from injuries to his head caused by a blow to the head and/or by a shaking of the child. This evidence, however, does not allow for a reasonable conclusion that the defendant caused the injuries with malice because the evidence does not reveal wickedness of disposition, hardness of heart, cruelty, recklessness of consequences, and a mind deliberately bent on mischief, or with a total disregard for human life. In addition, there is no evidence that the defendant willfully injured his child from which a reasonable jury could infer malice.[2] Instead, the evidence reveals a father genuinely concerned with the health and well-being of his child. The uncontradicted evidence reveals a father who, when concerned for the life of his young child, took several steps to save the life of his child: he aspirated mucus from the nose of his child; called his wife to come home when he discovered his child was not breathing; shook his child in an attempt to arouse him; called 911 for an ambulance; and administered cardiopulmonary resuscitation to his child with the help of a neighbor. Thus, the case should not have been submitted to the jury on second-degree murder.

---

2. I acknowledge that malice can be inferred when a "strong or mature person" attacks a child by "hands or feet," as such an attack "is reasonably likely to result in death or serious bodily injury." *Elliott*, 344 N.C. at 269, 475 S.E.2d at 213. In this case, however, there is simply no substantial evidence that the defendant *attacked* his child.

Accordingly, I would: (1) reverse the conviction for felonious child abuse; and (2) reverse the conviction for second-degree murder and remand that matter to the trial court for a new trial. *See* N.C.G.S. § 15A-1447(c) (1997).